**STATE of Tennessee**

v.

**Arthur T. COPELAND.**

Supreme Court of Tennessee,
at Knoxville.

Jan. 3, 2007 Session.

May 23, 2007.

Robert E. Cooper, Attorney General and Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Kirk Andrews and Edward P. Bailey, Jr., Assistant District Attorneys General, for the appellant, the State of Tennessee.

Randall E. Reagan and Gerald L. Gulley, Jr., Knoxville, Tennessee (on appeal); and W. Phillip Reed and Robert W. White, Maryville, Tennessee (at trial), for the appellee, Arthur T. Copeland.

## OPINION

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and CORNELIA A. CLARK, JJ., joined.

The Defendant, Arthur T. Copeland, was convicted of one count of first degree murder and sentenced to death. The jury found a single aggravating circumstance, that the Defendant previously had been convicted of one or more felonies involving violence to the person, *see* Tenn.Code Ann. § 39–13–204(i)(2) (1997), and further found that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt, *see* Tenn.Code Ann. § 39–13–204(g)(1) (1997). The Court of Criminal Appeals held that the trial court properly excluded expert testimony

on eyewitness identification but committed plain error by failing to conduct a hearing pursuant to *Momon v. State,* 18 S.W.3d 152, 157 (Tenn.1999), and ordered a remand for a determination of whether the error was harmless. Further, the Court of Criminal Appeals set aside the sentence of death as disproportionate. We granted the State's application for permission to appeal in order to resolve the dispositive issues. We first hold that the trial court erred by prohibiting the Defendant from offering expert testimony regarding eyewitness testimony and overrule *State v. Coley,* 32 S.W.3d 831 (Tenn.2000). Because the exclusion of the testimony cannot be classified as harmless under these circumstances, the Defendant must be granted a new trial. Although the trial court failed to conduct a *Momon* hearing, consideration of that issue is not necessary because of the grant of a new trial. Finally, we conclude that the Court of Criminal Appeals erred by finding that the death sentence was disproportionate; thus the State may choose to seek the death penalty upon remand. Accordingly, the judgment of the Court of Criminal Appeals is affirmed in part, reversed in part, and the cause is remanded for a new trial.

### Factual and Procedural Background

On April 7, 1998, the victim, Andre Jackson, was shot to death in Maryville, Tennessee. The shooting was apparently in response to the rape of Lynn Porter ("Porter"), the girlfriend of Reginald Stacy Sudderth ("Sudderth"). After learning of the rape, Sudderth purportedly offered a $10,000 "bounty" for the death of the perpetrator and warned, "[S]omeone is going to die tonight." There was evidence that the Defendant expressed an interest

in the reward money and accompanied Sudderth and others to Maryville in search of the victim, whom they believed to be responsible for the rape. According to one State witness, the Defendant entered the victim's residence and ordered him outside. Moments later, the victim reentered the house, collapsed from gunshot wounds, and died. In the course of a lengthy trial over an eight-day period with contested factual and witness credibility issues, the Defendant claimed that he was mistakenly identified and suggested that Chris Knighton ("Knighton") was the perpetrator of the crime.

### I. Evidence at the Guilt Phase

In its proof-in-chief, the State established that some ten months prior to the shooting, Edna Delapp ("Delapp"),[1] a white female and the mother of the victim's girlfriend, Stephanie Delapp, had allowed the victim, a black male, to move into her residence in an effort to help him get his life "back on track." On the day of the rape, Delapp was off from work. During the afternoon, the victim briefly introduced her to Knighton, a black male, before the two men left the residence. At 11:30 p.m., the victim returned in the company of Delapp's daughter. Less than three hours later, Delapp was awakened by a "very insistent pounding" at the front door. She looked out her bedroom window but saw no cars in the driveway. When she walked to the front door and peered through its glass panes, however, she saw a black male she believed to be Knighton. She opened the door, and the man entered and asked to talk to the victim.

As the two walked through the hallway, Delapp, whose identification testimony was

1. For purposes of clarity, Edna Delapp is referred to as Delapp and her daughter is referred to throughout the opinion by her full name, Stephanie Delapp, or is identified as the victim's girlfriend or Delapp's daughter.

a crucial component of the State's theory, decided the visitor was not Knighton but she nevertheless opened the door leading down to the victim's room and called out his name. When there was no response, the man expressed his intention to "go get" the victim and walked down the stairwell into the victim's room. Delapp briefly returned to her bedroom, again looked out the window, and saw no one. By then, she saw the victim in the hallway followed by the visitor. She described the visitor as wearing dark clothing and having "really weird hair" with "little twisted ponytails." When the two men walked out the front door, Delapp, who had observed the visitor for only "seconds," returned to her bedroom window, again looked outside, but saw nothing. A few moments later, however, she heard shots and glass shattering. She ran from her bedroom and encountered the victim, who was "hunkered down and running, just as fast as he could." The two collided, and Delapp fell down, cutting her forehead, which bled profusely. Delapp then ran to the living room and slammed the front door. As she treated her injury, her daughter appeared. The two women then searched for the victim, who was found lying on the floor of the master bathroom wearing black and red tennis shoes.

Delapp, who in advance of trial had declined to be interviewed by the defense, made a positive identification at trial, emphasizing that she had "eye-to-eye contact" with the Defendant. She explained that the two had "stared at each other for two full seconds." On the day after identifying the Defendant from the photographs displayed by the police, Delapp saw the same picture of the Defendant in the local newspaper with an article stating that he had been arrested and charged with murder. When Delapp later identified the Defendant at trial, she remarked that "his eyes were so intense, I'll never forget him."

Stephanie Delapp testified that several hours prior to the shooting, she learned from the victim's mother, Diva Brown, that Porter had been raped and that the victim might be involved. Stephanie Delapp stated that she drove to Alcoa to meet the victim, who she believed to be involved in illegal drug sales, for the purpose of returning him to their residence. When she arrived, the victim was with Knighton. Neither appeared to have weapons. Upon returning to their residence, Stephanie Delapp and the victim retired to their basement bedroom. When she was awakened by screams at 2:15 a.m., she went upstairs and found her mother in a guest bathroom with blood on her face. When her mother told her about the gunfire, Stephanie Delapp armed herself with a knife from the kitchen and then walked to the master bathroom, where she found the mortally wounded victim.

Maryville Police Sergeant Gary Nitzband, one of the first officers to arrive at the Delapp residence, found the body of the victim in a bathroom. There were three apparent gunshot wounds, one to the groin and two to the upper body. Small amounts of crack cocaine were found in several locations in the victim's basement bedroom. After leaving the Delapp residence, Sergeant Nitzband drove to the Gardenvale Apartments to question a woman named Karla Bragg ("Bragg"), who dated Knighton. Bragg, who appeared "excited" and "scared," provided information that cast suspicion on the Defendant.

At trial, Bragg testified that at approximately 2:30 a.m., some fifteen minutes after the shooting, the Defendant knocked on her door and told her he was looking for Knighton. She stated that he was wearing all black clothing, black gloves, and had his hair sticking up in "plaits" or small braids.

Detective Bill Manuel, who transported Delapp and her daughter to the police station after the shooting, testified that the two women were interviewed separately. At that time, neither could identify the suspect. The officer recalled that Delapp had described the perpetrator as a black male, about five-feet-eleven inches tall, wearing dark clothing, and having little "horns" of twisted hair. Later that day, after the photographic lineup, Detective Manuel informed Delapp that she had identified the person police suspected in the victim's shooting. At trial, the Detective explained that because Knighton was never a suspect in the victim's murder, his photo was not included in the photographic array shown to Delapp. Detective Manuel did not record his interviews, taking brief notes instead.

Maryville Police Detective David Graves and Detective Manuel, who investigated the lighting conditions inside the Delapp residence as they were on the night of the murder, found that there were four, twenty-five-watt lights in the hallway area. Detective Graves testified that although the bulbs were not "real bright," he was able to distinguish the facial features of Detective Manuel, with whom he had worked on an almost daily basis for more than sixteen years.

Dr. David Gilliam, who performed the autopsy, found three gunshot wounds to the front of the body. One bullet entered the collarbone from close-range, a second entered the chest, and a third entered the groin. It was Dr. Gilliam's opinion that the wounds to the collarbone and chest, each of which had passed through the victim's back, would have been fatal. He testified that an individual could have easily run one hundred yards after sustaining these wounds. Dr. Gilliam stated that if the shot to the groin occurred first, that would have caused the victim to bend over

in pain and would explain the downward trajectory of the two bullets through the torso. The wounds were caused by either a nine millimeter or .45 caliber weapon. Massive blood loss and a collapsed lung from the two gunshot wounds to the upper body were the causes of death. Dr. Gilliam found the presence of marijuana in the victim's body.

Porter testified that on the day before the shooting, she arrived at her residence and discovered two male intruders, one tall and one short. The men, who had kicked open her back door to gain entry, were armed with a knife and a gun. Although both wore coverings over their faces, Porter described one of the men as a light-skinned black male. Each wore black clothing, and one of the men was wearing red tennis shoes. She could not otherwise identify either of the intruders. The men instructed Porter to have Sudderth provide $10,000 in a clear plastic bag by 10:00 p.m., but she was unable to immediately reach Sudderth by telephone. When the shorter of the two men left the room, the taller man raped her. After the men left, Porter was able to contact Sudderth, who arrived at her residence at the same time as the police. Porter was first taken to the hospital and then questioned at the police station. Afterward, Sudderth remained with her for a time before taking her to the home of her mother. She claimed that she never informed Sudderth or anyone else that she knew for certain who had raped her.

Porter, who had dated Sudderth for ten years, testified that she had known David Bell Brown ("Brown"), a friend and employee of Sudderth, for over ten years. While acknowledging having seen the Defendant before, she insisted that he was not a friend to either her or Sudderth. Although she had not seen either assail-

ant's face,[2] Porter noted that she had informed Sudderth that the rapist reminded her of a man named Toure Teeter ("Teeter"). During the rape investigation, she had also told police that the rapist could have been the Defendant. At trial, however, Porter testified that she had come to believe that the victim was the rapist and that Knighton was the other intruder at her residence.[3]

At approximately 5:00 p.m. on the day before the shooting, Billy Williams ("Williams") was shooting dice at the Howe Street Park in Alcoa when Sudderth and Homer Henderson ("Henderson") arrived. Both the victim and Knighton were sitting on a bench nearby. Williams did not see the Defendant at that time. At trial, Williams testified that Sudderth jumped out of the car and yelled, "[Y]ou young mother f——s are wrong … the $10,000 you came for, it's a bounty … a reward for your head." When Williams asked what he was talking about, Sudderth responded, "The $10,000 you wanted, come get it, when I find out who done it, you're dead." According to Williams, Sudderth informed the group that one of the men who had demanded his money wore red Air Jordan tennis shoes.

Victor Hodge ("Hodge"), who witnessed the conversation, described Sudderth as "real upset" with "tears running out of his eyes." Hodge testified that Sudderth slammed his hand on the hood of his car and said, "[Y]ou … got my attention … you all had no business doing that to the girl …, and you all wanted ten thousand … I got ten thousand dollars." Hodge recalled that later that same evening, he saw the Defendant and Brown at "Jack's Place" and overheard the Defendant "just blurt[ ] out that he had to have that ten thousand and wanted to get in touch with Sudderth."

Hodge acknowledged that Porter's rape was the main topic of discussion within the community during the course of the afternoon and evening and that there was a lot of speculation about the identity of the perpetrator. He recalled that when he left Jack's Place shortly after midnight, the Defendant was still there. According to Hodge, the Defendant ordinarily wore his hair either in braids or in an Afro. He testified that Knighton and the Defendant resembled each other when their hair was styled similarly.

Tyrone Haley ("Haley"), who at the time of the trial was serving a sentence for a drug offense, testified that approximately five hours before the shooting, he saw the Defendant standing alone on the corner of Howe Street. He described the Defendant as dressed in all black clothing and stated that the Defendant had a weapon with a long clip and a muzzle around the nozzle. Haley, who claimed that the Defendant had robbed him two years earlier, contended that he had not reported seeing the Defendant before the victim's murder because the Defendant had threatened to kill him.

Shortly before midnight and just hours before the shooting, Kimani Dean ("Dean") witnessed the Defendant standing in a parking lot near Howe Street and talking with a girl named Giovanna Hodge. Dean confirmed that the Defendant was dressed in all dark clothing and that his hair was plaited down the back of his head.

---

**2.** Porter could not discern the race of the person accompanying the rapist.

**3.** In a separate trial, Knighton was convicted of aggravated rape, aggravated burglary, and theft. *See State v. Knighton*, No. E2000-00746–CCA–R3–CD, 2001 Tenn.Crim.App. LEXIS 224 (Tenn.Crim.App. Mar. 14, 2001).

Teeter, at one time a suspect in the rape and a friend of Stephanie Delapp and the victim, testified that on the night before the murder, he saw the Defendant in front of Jack's Place "raising a lot of Cain," asserting that he had been falsely accused by some of the Porter rape. According to Teeter, the Defendant stated, "You all got me f——d up. I'm going to go down in history tonight, somebody [is] going to die tonight." Teeter also testified that while Knighton and the victim were inside Porter's residence, they telephoned him several times, asking him to bring them another gun. He claimed that he did not take them a gun and insisted that he tried to persuade them to leave Porter's residence.

Myron Kellogg ("Kellogg") testified that he saw the Defendant at Jack's Place several hours before the shooting complaining that "he needed to make this money, he needed to get this over with, go on and do this." Kellogg stated that a girlfriend, Ashley James ("James"), drove him to his residence and at approximately 1 a.m., he received a telephone phone call from Brown, who was with Sudderth. Kellogg testified that Sudderth asked the whereabouts of Knighton and the victim and inquired about the location of the victim's girlfriend's residence. He related that on the following morning he saw James again and she was "hysterical" and "excited." According to Kellogg, James informed him that she met Henderson, Sudderth, Brown, and the Defendant sometime after midnight and that they had guns. Kellogg also learned that she had given Henderson the victim's Maryville address and that she accompanied Henderson and the Defendant to the residence in one car while Sudderth and Brown were in a separate vehicle. Kellogg testified that James informed him that when they arrived at the victim's residence, the Defendant got out of Henderson's car and joined Sudderth and Brown in their car. According to the

witness, James claimed that she and Henderson then left, driving to a Kay's Ice Cream shop around the corner.

Kellogg, who had known James for about three years and who had allowed her to live with him, conceded that it was "possible" that they had used drugs together and had a sexual relationship. He also admitted that he had seen James use cocaine, was aware that she had been in a drug rehabilitation program, and knew that she was no longer allowed to live with her parents. Kellogg, who claimed that he had attempted to convince James to tell police what she knew, acknowledged that he had not informed the police of James's revelation until a year and a half after the shooting. He stated that in June of 2000, over two years after the crime, he accompanied Detective Manuel to James's place of employment in an effort to persuade her to make a statement.

Margaret Amason, Brown's girlfriend, testified that on the day of the rape, she was awakened around midnight by Brown and the Defendant. They were playing music and laughing. She stated that the Defendant was rolling marijuana "blunts" and Brown was making sandwiches. She directed them to leave and both complied with the request. When she awoke the following morning, Brown was sitting on her bed, tying his shoes.

Another State witness, Michael Curtis ("Curtis"), claimed to have seen Henderson driving a black vehicle belonging to Henderson's wife approximately three hours before the shooting. He stated that the Defendant and two women were passengers in the car. Curtis, who explained that the Defendant had recently broken up with his sister, recalled that the Defendant was wearing his hair in four braids that night, two in the front and two down the back. Curtis stated that on the

following day, he saw Knighton, who was wearing his hair in four braids identical to the style the Defendant wore the night before.

Robyn Rainer ("Rainer"), testified that shortly before dark on the day before the shooting, the victim dropped off Knighton at her house. She contended that Knighton slept on her couch and that at approximately 3:00 a.m., the Defendant arrived at her residence and informed them that the victim was dead. She testified that Knighton became nervous after learning of the shooting. Rainer stated that when the Defendant asked to spend the night at her residence, she declined, explaining that she had no more room. According to Rainer, the Defendant left and did not return. She stated that on the next day, Knighton informed her that during the hours before dawn, he had left the residence and then returned. Rainer described Knighton, who had a gun in his possession, as very nervous, attempting to avoid detection when there were knocks at the door.

James testified that on the day before the shooting, she and Kellogg went to Alcoa together but later separated. She stated that she went to the Howe Street Park to drink beer and visit with friends, while Kellogg went to Jack's Place. Afterward, she met Sudderth and Henderson at a nearby store, where she learned that they were looking for the victim and Knighton in connection with the Porter rape. She testified that she picked up Kellogg, drove him to his residence, and then met Henderson, who had a gun, at the same store. Henderson informed her that he and Sudderth were still looking for the victim and Knighton "because they had raped Lynn." She recalled that Henderson explained that Sudderth "was his cousin and he wasn't going to let him down." James stated that she traveled to the victim's residence with Henderson, Sudderth, and the Defendant, who was wearing a black sweatshirt. She recalled that when the Defendant identified Stephanie Delapp's car, which was parked in front of the house, the group left, returned Sudderth to his truck, and picked up Brown. James testified that Brown then drove to another residence to acquire a gun. While Brown was inside the residence, the Defendant remarked that he needed to get some "cheese," or money, to get out of town. Upon returning to the vehicle, Brown handed the gun to the Defendant. James stated that the Defendant and Brown joined Sudderth, while she and Henderson drove to a motel in Knoxville, checking in before midnight. She recalled that an hour or so later, Henderson left, explaining that he had been paged and would be "right back." When he returned at 8:00 a.m. the following morning, he informed her of the victim's death.

James admitted that Kellogg paid her expenses and supplied her with drugs and admitted a sexual relationship with him. She also acknowledged having a sexual relationship with Henderson, even though she knew he was married. She denied having traveled with Henderson to Kay's Ice Cream or hearing gunshots, and insisted that she did not help plan the victim's murder. She also denied fabricating her testimony in an effort to keep Kellogg out of jail.

On the morning of April 7, 1998, only hours after the shooting, Officer Danny Wilburn of the Blount County Sheriff's Department was dispatched to an address on Alcove Boulevard. The Defendant, who was obviously injured, was lying on the front porch. Although the Defendant could barely speak, he told the officer that he had been shot in the upper buttocks by a "Bella" or David, an apparent reference to Brown, who, along with another male, had departed in a green Toyota 4-Runner.

Officer Wilburn observed that the Defendant's hair was tightly braided around his head.

Later that day, Officer Rusty Borden stopped a green Toyota 4–Runner near the Foothills Mall in Maryville. Sudderth was driving and Brown was his passenger. There was a gun on the passenger floorboard and a roll of cash totaling $10,400 in the console.

As a part of the defense, Beverly Black ("Black"), Henderson's mother-in-law and Kellogg's next-door neighbor, testified that two months before the trial, she asked Kellogg whether he was still selling drugs and whether his drug charges were still pending. According to Black, Kellogg answered that he had made a deal to testify to what police wanted to hear about the victim's murder, assuring them that James would do the same. Black recalled that Kellogg also said that, as a part of the deal, James would not be charged with conspiracy in the murder. She also testified that Kellogg had informed her that the police had taken cocaine valued at $30,000 from him and that he needed to make up that loss. She opined that Kellogg was often untruthful and stated that she did not believe his statement that the police had taken his cocaine. During cross-examination, Black stated that she informed Detective Manuel about Kellogg's claims before the trial. She recalled that the detective made no comment. She testified that after hearing Kellogg's testimony, she provided defense counsel with her information because she was "appalled" by the lies Kellogg had told.

Cathy Kivett ("Kivett"), also a defense witness, recalled that on the morning after the victim's death, the Defendant knocked on her door, told her that he had been shot, and asked her to call for help. She described the Defendant as wearing a gold chain and a dark blue tank top and shorts. Kivett stated that his hair was tightly braided and was not sticking out from his head.

A third defense witness, Detective Warren Headrick, first observed the Defendant in the back of the ambulance at the Kivett residence. He heard the Defendant's claim that he had been shot by a person named "Bella." Detective Headrick determined that the Defendant indeed had been shot with the gun found in Sudderth's green Toyota. The police investigation indicated that the Defendant had been shot at a barn belonging to a relative of Sudderth located on Cedar Church Road.

Upon this evidence, the jury returned a verdict of guilty of first degree murder.

## II. Evidence at the Sentencing Phase

During the penalty phase of the trial, Tom Hatcher, Circuit Court Clerk for Blount County, produced documentation of the Defendant's prior conviction for aggravated robbery. Detective Dale Boring, the prosecuting officer on the aggravated robbery charge, testified that the Defendant had pleaded guilty. The robbery indictment identified the Defendant as "Anthony Carter, Jr., alias."

The victim's mother, Diva Brown,[4] testified that because the victim was her only child, she would never be the same and wanted to die. She stated that after he moved out of her residence, she spoke to and saw the victim often. Diva Brown described the victim as "a sweet loving child, full of fun," but it was her opinion that he left home to live with his girlfriend in order to deal drugs. She recalled that

---

**4.** Diva Brown is referred to by both her first and last names in order to avoid confusion with David Bell Brown, a friend and employee of Sudderth.

she last saw the victim on the morning before his murder and that a friend later informed her that the victim might have been involved in the rape of Porter. Diva Brown testified that she did not believe her son would do "something that stupid."

Elizabeth Faye Dean, an aunt to the victim, described the victim as particularly close to her children. She stated that his death had been especially painful for her.

The Defendant, who was twenty-seven years old, admitted having prior convictions for theft over $10,000, reckless endangerment, and aggravated robbery. He testified that he entered a best interest plea to the aggravated robbery charge.[5] He claimed that the robbery charge arose out of a fight that escalated when someone pulled out a knife. The Defendant explained that after the fight, he picked up some items from the ground, resulting in the robbery charge, and then fled from police.

The Defendant testified that he was raised by his mother until age fourteen, at which time he decided it was time to be on his own. He stated that he initially lived with a girlfriend, but was later incarcerated in various juvenile facilities. The Defendant related that he had not spent more than five consecutive months out of incarceration since he went out on his own. He testified that he had obtained his GED during his most recent incarceration. He described his mother as his best friend and explained that he did not want her to hear his testimony because of the stress that she had experienced during the trial. The Defendant testified that he had custody of his seven-year-old son before the murder charges and had written him regularly since.

During cross-examination, the Defendant acknowledged that he had caused the injuries to the robbery victim. He agreed that he had previously testified that the robbery victim's face was crushed "probably from the kicks or something." The Defendant explained that he drank and smoked marijuana "every day" at that time in his life. He stated that he tried to support his son by "hustling," explaining that without an education, he could not get a "real job."

At the conclusion of the penalty phase, the jury sentenced the Defendant to death. The jury found that one aggravating circumstance, that the Defendant was previously convicted of one or more violent felonies, had been proven beyond a reasonable doubt. See Tenn.Code Ann. § 39–13–204(i)(2) (1997). The jury also found that the evidence of the aggravating circumstance outweighed evidence of mitigating circumstances beyond a reasonable doubt. See Tenn.Code Ann. § 39–13–204(g)(1) (1997).

The Court of Criminal Appeals ruled that the trial court's failure to conduct a *Momon* hearing was plain error and remanded the case to the trial court to determine whether the error was harmless. The intermediate appellate court also concluded that the Defendant's death sentence was unconstitutionally disproportionate and set aside the sentence of death.

This Court granted the State's application for permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. The primary issues for consideration surround the trial court's exclusion of the testimony by an expert on eyewitness identification, the failure to ascertain whether the Defendant had personally waived his right to testify, and the question of proportionality.

---

**5.** *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

## Analysis

### I. Exclusion of Expert Testimony Regarding Eyewitness Identification

■ The Defendant contends that the trial court erred by prohibiting expert testimony on the issue of the reliability of eyewitness identification. The record establishes that the defense sought to call as a witness John Brigham, a university professor of psychology, to testify as to the reliability of eyewitness identification, particularly related to cross-racial identification, an issue in this case. The trial court, relying on the Court of Criminal Appeals' decision in *State v. Wooden*, 658 S.W.2d 553 (Tenn.Crim.App.1983), ruled that the evidence was inadmissible. In *Wooden*, a case decided twenty-four years ago, the Court of Criminal Appeals concluded that "[w]hether an eyewitness's testimony is reliable is a matter which the jury can determine from hearing the witness's testimony on direct and cross-examination and which does not require expert testimony." *Id.* at 557. After conducting a hearing outside the presence of the jury and permitting an offer of proof, the trial judge concluded that but for the ruling in *Wooden* he would have admitted the expert testimony, observing, "I have to ... follow [*Wooden*] whether I personally agree with it or not."

Some three months after the conclusion of the trial in this case, this Court issued its opinion in *State v. Coley*, 32 S.W.3d 831 (Tenn.2000), adopting the holding in *Wooden*. In *Coley*, a majority of this Court concluded that Tennessee Rule of Evidence 702 precluded expert testimony concerning the reliability of eyewitness testimony, observing that "general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does not substantially assist the trier of fact." *Id.* at 838. The majority determined that "[e]yewitness testimony has no scientific or technical underpinnings which would be outside the common understanding of the jury; therefore, expert testimony is not necessary to help jurors 'understand' the eyewitness's testimony." *Id.* at 833–34. Our ruling in *Coley* placed Tennessee in the minority of jurisdictions that have considered the issue. *Id.* at 838.[6]

The *Coley* dissenters concluded that the general rule established in *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997), wherein the trial court is afforded discretion as to the qualifications and relevancy of the testimony of an expert witness, was a sufficient guide to trial courts in determining whether to admit expert testimony on the issue of eyewitness identification. *Coley*, 32 S.W.3d at 838–39 (Holder, J., dissenting). Justice Holder, joined by then Chief Justice Anderson, observed that the majority's decision "exclud[ed] from consideration under *McDaniel* one class of proffered scientific evidence" and "foreclose[d] judicial recognition of future scientific advances." *Id.* at 839 (Holder, J., dissenting). Citing the sheer volume of "scientific study, scholarly debate, and comment" on the subject of eyewitness identification, the dissent, especially critical of the classification of the reliability of eyewitness identification as falling within the "common understanding" of jurors, concluded that it was unlikely that so much scholarly and scientific work had been "engendered by what is simply a matter of common knowledge." *Id.* (Holder, J., dissenting).

---

**6.** Compare *State v. McKinney*, 74 S.W.3d 291 (Tenn.2002), where we held that the exclusion of such expert testimony could violate the due process right to a fair trial if the excluded evidence was critical to the defense and was reliable.

There have been advances in the field of eyewitness identification. In the article *Behavioral Science Evidence in the Age of Daubert: Reflections of a Skeptic,* Boston College Law Professor Mark S. Brodin, a self-described skeptic on the topic of behavioral science evidence, made the following observation:

> Ironically, the form of social science evidence which is most solidly based in "hard" empirical science has met with the most resistance in the courts. Expert testimony concerning the limitations and weaknesses of eyewitness identification is firmly rooted in experimental foundation, derived from decades of psychological research on human perception and memory as well as an impressive peer review literature.

Mark S. Brodin, *Behavioral Science Evidence in the Age of Daubert: Reflections of a Skeptic,* 73 U. Cin. L.Rev. 867, 889–90 (2005) (footnotes omitted). Another author has observed that while experts are often not permitted to testify regarding eyewitness testimony, police officers and other law enforcement officials are regularly permitted to testify "concerning the general way criminal schemes and enterprises operate and the usual meaning of criminal slang and code words." D. Michael Risinger, *Navigating Expert Reliability: Are Criminal Standards of Certainty Being Left on the Dock?,* 64 Alb. L.Rev. 99, 132 (2000). The author contrasts the "technical" knowledge of the law enforcement officials with the educational and scientific credentials of experts on eyewitness identification. *Id.* at 131–35.

It is the educational training of the experts and empirical science behind the reliability of eyewitness testimony that persuades us to depart from the *Coley* rule. Times have changed. Today, many scholarly articles detail the extensive amount of behavioral science research in this area.

*See generally* Gary L. Wells et al., *Eyewitness Evidence: Improving Its Probative Value,* 7 Psychol. Sci. Pub. Int. 45, 47–49 (2006) (for a brief history of psychological research of eyewitness testimony). There are literally hundreds of articles in scholarly, legal, and scientific journals on the subject of eyewitness testimony.

Our decision in *Coley* is also contrary to the modern trend:

> [S]tudies of DNA exonerations ... have validated the research of social scientists, particularly in the areas of mistaken eyewitness identification.... Courts traditionally tended to exclude scientific evidence from expert witnesses in these disciplines, primarily on the basis that the testimony addressed matters within the common understanding of jurors, was confusing, or that it invaded the province of the jury to make credibility determinations. However, with the increased awareness of the role that mistaken identification ... play[s] in convicting the innocent, a new trend is developing regarding the admissibility of expert testimony.

Jacqueline McMurtrie, *The Role of the Social Sciences in Preventing Wrongful Convictions,* 42 Am.Crim. L.Rev. 1271, 1273 (2005) (footnotes omitted). McMurtrie observes that "[r]esearch over the past thirty years has shown that expert testimony on memory and eyewitness identification is the only legal safeguard that is effective in sensitizing jurors to eyewitness errors." *Id.* at 1276. Studies have shown that erroneous identification accounted for as much as eighty-five percent of the convictions of those individuals later exonerated by DNA testing. *Id.* at 1275 n. 17.

Scientifically tested studies, subject to peer review, have identified legitimate areas of concern. *See id.* at 1277 n. 29 (citing Brian L. Cutler et al., *Juror Sensitivity to Eyewitness Identification Evi-*

*dence*, 14 Law & Hum. Behav. 185, 190 (1990) (concluding that jurors were insensitive to many factors that influence eyewitness memory and give disproportionate weight to the confidence of the witness); Timothy P. O'Toole et al., *District of Columbia Public Defender Eyewitness Reliability Survey*, Champion, Apr. 2005, 28, 28–32 (finding, in a survey of approximately 1,000 potential jurors, that they overestimate the reliability of cross-racial identification); Gary Wells et al., *Eyewitness Identification Procedures: Recommendations For Lineups and Photospreads*, 22 Law & Hum. Behav. 603, 619–20 (1998); Richard A. Wise & Martin A. Safer, *A Survey of Judges' Knowledge and Beliefs About Eyewitness Testimony*, 40 Ct. Rev. 6, 8–14 (2003) (finding that judges had limited understanding regarding eyewitness accuracy and confidence and with studies indicating that half or more of all wrongful felony conviction are due to eyewitness misidentification)). The Utah Supreme Court has made the following observations in this regard:

> Although research has convincingly demonstrated the weaknesses inherent in eyewitness identification, jurors are, for the most part, unaware of these problems. People simply do not accurately understand the deleterious effects that certain variables can have on the accuracy of the memory processes of an honest eyewitness. *See* K. Deffenbacher & E. Loftus, *Do Jurors Share a Common Understanding Concerning Eyewitness Behavior?*, 6 Law and Human Behavior 15 (1982); J. Brigham, R. Bothwell, *The Ability of Prospective Jurors to Estimate the Accuracy of Eyewitness Identification*, 7 Law and Human Behavior 19 (1983). Moreover, the common knowledge that people do possess often runs contrary to documented research findings. *See* Loftus, *supra*, at 171–77.

*State v. Long*, 721 P.2d 483, 490 (Utah 1986).

Further, the research also indicates that neither cross-examination nor jury instructions on the issue are sufficient to educate the jury on the problems with eyewitness identification, contrary to the conclusion reached by the majority in *Coley*. *See, e.g., id.* ("[E]ven when presented with an eyewitness who was quite thoroughly discredited by counsel, a full 68% still voted to convict.") (citing Elizabeth Loftus, *Reconstructing Memory: The Incredible Eyewitness*, 15 Jurimetrics J. 188, 189–90 (1975)). "Considered as a whole, the studies of juror knowledge and decision making indicate that expert psychological testimony can serve as a safeguard against mistaken identification." Steven D. Penrod & Brian L. Cutler, *Preventing Mistaken Identification in Eyewitness Identification Trials*, Psychology & Law: The State of the Discipline 89, 114 (1999).

In our view, it is far more likely for the jury to accredit the eyewitness than the expert. If eyewitness identification is a cornerstone of the criminal justice system, the jury is its foundation. It is also our view that the test in *McDaniel* is sufficient to allow the trial court to properly evaluate the admissibility of expert testimony on the reliability of eyewitness identification. To the extent that *Coley* holds otherwise, it is overruled. The essential role of the judge, as the neutral arbiter in the trial, is to govern the admission of the evidence within the rules, permitting only that expert testimony which substantially assists the jury in its consideration of the issue. The *McDaniel* test provides the trial judge with the necessary guidelines to properly exercise his or her discretion.

■ Because we have chosen to overrule *Coley's* conclusion that no one, regardless of credentials or experience and no

matter how questionable the evidence, can provide testimony on the issue of eyewitness identification, we must next determine whether the trial court's failure to permit Dr. Brigham to testify was error. If so, a second question is whether the error can be classified as harmless. *See* Tenn. R.Crim. P. 52(a); Tenn. R.App. P. 36(b).

 As indicated, the general rule is that "questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel,* 955 S.W.2d at 263 (citing *State v. Ballard,* 855 S.W.2d 557, 562 (Tenn.1993)). A decision by the trial judge to admit or exclude expert testimony "may only be overturned if the discretion is arbitrarily exercised or abused." *Id.* at 263–64. Further, the admission of expert proof is governed by Tennessee Rules of Evidence 702 and 703. *Brown v. Crown Equip. Corp.,* 181 S.W.3d 268, 273 (Tenn.2005). Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will *substantially assist the trier of fact to understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702 (emphasis added). Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evi-

> dence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703. Further, expert testimony must qualify as relevant: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

 In *McDaniel,* this Court adopted a non-exclusive list of factors to consider when determining the reliability of expert testimony:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye,*[7] the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel,* 955 S.W.2d at 265. The trial court "must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Id.* "The objective of the trial court's gatekeeping function is to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " *Brown,* 181 S.W.3d at 275 (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that a trial court may consider the *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509

---

**7.** *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).

U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), factors in assessing the reliability of non-scientific expert testimony in accordance with the Federal Rules of Evidence)). Rigid application of the *McDaniel* factors is not required. *Id.* at 277. This Court has observed that

> [t]he reasonableness of the *McDaniel* factors in assessing reliability depends upon the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony. The *McDaniel* factors may apply, subject to the trial court's discretion, when they are reasonable measures of the reliability of the expert testimony.

*Id.* (citations omitted).

Because the trial judge in this case excluded Dr. Brigham's testimony on the basis of the decision in *Wooden*, there was no formal evaluation of the testimony under the Rules of Evidence. The trial judge did indicate, however, his preference to allow the testimony in the absence of binding precedent to the contrary.

Dr. Brigham, a psychology professor with more than thirty-five years' experience in the study of the accuracy of eyewitness identification, testified that since undertaking research on the subject in 1975, he had published forty-five studies and had read "many hundreds" more. He described his discipline as "mainstream" and "widely accepted" within the profession. While acknowledging that common sense suggests that the certainty of the identification is a good indicator of its reliability, he testified that "research has shown that there is little or no relationship between [the level of the eyewitness's] certainty and [its] accuracy." Dr. Brigham explained how extraneous factors such as "stress and arousal, presence of a weapon, race, age, opportunity to observe" can affect the accuracy of a memory.

Dr. Brigham's proffered testimony was directed primarily at the eyewitness identification by Delapp. He expressed particular concern about cross-racial identification in general and hers of the Defendant in particular. Dr. Brigham explained how in his opinion the subsequent events may have reinforced the correctness of Delapp's otherwise questionable identification. For example, after her identification of the Defendant in the photographic array, Detective Manuel commented that the person she had identified was the primary suspect. Shortly thereafter, she saw a photograph of the Defendant in the newspaper linking him to the crime.

In our view, Dr. Brigham's testimony satisfies the requirements of the *McDaniel* test in that it is reliable and would have been of substantial assistance to the jury. The proffered testimony was based upon solid empirical data gathered in a scientific setting. The information was subjected to a thorough peer review process. His opinions were formulated from extensive research and would have given the jury a valuable context within which to assess the eyewitness identification. Moreover, the trial judge, who saw and heard the witnesses firsthand, expressed a desire to allow the testimony as particularly helpful under the circumstances of this case.

It is also our view that the error cannot be classified as harmless. *See* Tenn. R.App. P. 36(b) ("A final judgment ... shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment...."); Tenn. R.Crim. P. 52(a) ("No judgment shall be reversed on appeal except for errors that affirmatively appear to have affected the result of the trial on the merits."). "[T]he line between harmless and prejudicial error is in direct proportion to the degree ... by which proof exceeds the standard required

to convict...." *Delk v. State*, 590 S.W.2d 435, 442 (Tenn.1979). In this case, the evidence of the Defendant's guilt was largely circumstantial. While the testimony of James, whose credibility was at issue, placed the Defendant in the car with Sudderth and others just prior to the shooting, only Delapp, a white woman, identified the Defendant, a black male, as the individual who entered her home and forced the victim outside.[8] Delapp admitted, however, that she initially believed that Knighton, whom she had seen only hours earlier, had entered her home. She initially stated that her interior lights were off. Later, she told police that she had four, twenty-five-watt bulbs turned on as the perpetrator entered the residence. Some witnesses testified that the Defendant and Knighton bore a resemblance to each other. Delapp testified that the perpetrator's hair "stuck out" in twisted "horns" while Dean, who saw the Defendant later, and other witnesses, including Detective Wilburn, indicated a tight braid or plaited style. Delapp described the Defendant as being dressed in clothing different from that described by Kivett. There was testimony that Knighton and the Defendant had their hair styled similarly at the time of the shooting. Detective Manuel confirmed that Knighton was not included in the photographic array shown to Delapp. Afterward, the officer reinforced the identification by informing Delapp that she had identified the individual that police suspected of the crime.

As stated, Delapp's testimony was the only direct link to the Defendant's participation in the murder. She expressed certainty about her identification despite vigorous cross-examination. She did not, however, see the Defendant fire any shots. Moreover, there was evidence that Sudderth, who was said to have been involved in the shots fired at the Defendant two or three hours later, was present at the time of the shooting. Other proof indicated that Brown, also involved in the subsequent shooting, may have been there. All had a motive to do harm to the victim. Neither Kellogg nor James made a statement to police until well after the shooting. Rainer testified that Knighton possessed a gun and had left her residence during the hours near the shooting for a purpose unknown to her. No weapon was found in the possession of the Defendant. The gun used to kill the victim was never found.

Dr. Brigham's testimony was designed to assist the jury in its evaluation of Delapp's testimony in terms of what is scientifically known about eyewitness identification, particularly that of a cross-racial nature. Under our rule, that assistance had to be "substantial" on a fact at issue in order to qualify for admission. The facts, especially on the question of identification, were contested at trial. There were conflicts in the testimony. There were significant challenges to the credibility of practically every State witness other than the law enforcement officers. Some

---

8. In March of 2006, the Defendant filed a petition for writ of error coram nobis in the trial court alleging that newly discovered evidence likely would have resulted in a different outcome at trial. The Defendant asserted that the State had failed to disclose exculpatory evidence in the form of a statement that Delapp gave to police at the time of the shooting. According to the Defendant's filing, the statement, which was not disclosed to the defense, was given by Delapp only one hour after the shooting. The statement differs from the testimony Delapp gave at both the trial and the preliminary hearing in that she stated that she "barely saw" the perpetrator, that there were no lights on prior to the shooting, and that it was dark inside the house when the shooting occurred. Although this Court denied the Defendant's motion for a stay of these appellate proceedings, the petition for writ of error coram nobis is still pending in the trial court and may be pertinent to the re-trial.

witnesses had prior felony convictions and were evasive, perhaps even untruthful, as to collateral matters. Under these circumstances, we cannot say that the erroneous exclusion of Dr. Brigham's testimony was harmless. Accordingly, we must reverse the conviction and remand the cause for a new trial.

## II. Failure to Conduct a Momon Hearing

■ In *Momon v. State*, 18 S.W.3d 152 (Tenn.1999), this Court established a new rule in order to assure that the accused in a criminal trial had personally waived his right to testify. In an effort to protect the fundamental right of the accused to testify in a criminal trial and to ensure that any waiver of that right was personal, knowing, and voluntary, this Court implemented a procedure requiring counsel to question a defendant on the record but outside the presence of the jury regarding his decision not to testify. *Momon*, 18 S.W.3d at 162. A defendant must demonstrate his knowledge of the following:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id.* The ruling applies prospectively. Because the Defendant's trial was conducted several months after this ruling, a *Momon* hearing was required.

The Defendant contends that the trial court erred by failing to ensure, on the record, that he had personally waived his right to testify. While the Defendant concedes that he failed to present this issue either at trial or in his motion for new trial, he insists that the trial court's omission rises to the level of plain error and warrants a remand to the trial court for consideration of the effect of the error. The Court of Criminal Appeals agreed and remanded the cause to the trial court for a determination of whether the error was harmless.

Because the Defendant is entitled to a new trial, however, it is not necessary for this Court to determine whether the omission qualifies as plain error. *State v. Baby John Doe*, 813 S.W.2d 150, 153 (Tenn. Crim.App.1991). The issue is moot. Any ruling would be advisory. *Dockery v. Dockery*, 559 S.W.2d 952, 954 (Tenn.Ct. App.1977). In *State ex rel. Lewis v. State*, 208 Tenn. 534, 347 S.W.2d 47 (Tenn.1961), this Court cited with approval the following language:

"However convenient or desirable for either party that the questions mooted in the case be authoritatively settled for future guidance, the court is not justified in violating fundamental principles of judicial procedure to gratify that desire. To invoke the jurisdiction of a court of justice, it is primarily essential that there be involved a genuine and existing controversy, calling for present adjudication...."

347 S.W.2d at 48 (quoting *Southern Pac. Co. v. Eshelman*, 227 F. 928, 932 (N.D.Cal. 1914)).[9]

---

**9.** While there is a public interest exception to

the rule prohibiting consideration of moot

### III. Proportionality Review

■ The State contends that the Court of Criminal Appeals erred by concluding that the Defendant's death sentence was disproportionate and by remanding for a new sentencing hearing. While it is the custom of this Court to refrain from addressing the comparative proportionality of the death penalty when there is a remand for a new trial, *see State v. Robinson*, 146 S.W.3d 469, 501 n. 17 (Tenn.2004), it is our view that the Court of Criminal Appeals did, in fact, erroneously declare that the penalty was disproportionate under the facts presented.[10] In the event the Defendant is convicted in the new trial, it is our view that the testimony in the penalty phase of the trial was sufficient to warrant capital punishment.

■ Typically, when a defendant has been sentenced to death, this Court is required to engage in a comparative proportionality analysis. Tenn.Code Ann. § 39–13–206(c)(1)(D) (1997). "[C]omparative proportionality review 'presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.'" *State v. Bland*,

958 S.W.2d 651, 662 (Tenn.1997) (quoting *Pulley v. Harris*, 465 U.S. 37, 42–43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)). "[T]his Court employs the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes.... [A] death sentence is disproportionate if a case is 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.'" *State v. Davis*, 141 S.W.3d 600, 619–20 (Tenn.2004) (quoting *Bland*, 958 S.W.2d at 668). "[T]he pool of cases considered by this Court ... includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." *Id.* at 620.

■ While there is no specific formula for comparing similar cases, this Court generally considers the following factors regarding the offense:

(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the ab-

---

issues, *see New Rivieria Arts Theatre v. State*, 219 Tenn. 652, 412 S.W.2d 890, 893 (Tenn. 1967), the circumstances here do not justify its implementation. This case is not among those types listed as eligible for consideration despite their mootness. *See* M.A. Leffingwell, Annotation, *Public Interest as Ground for Refusal to Dismiss an Appeal, Where Question Has Become Moot, or Dismissal Is Sought by One or Both Parties*, 132 A.L.R. 1185 (1941). The question presented is personal to this Defendant. *See McCanless v. Klein*, 182 Tenn. 631, 188 S.W.2d 745, 747 (Tenn.1945) ("[T]he rule calling for dismissal of cases which become moot pending appeal is applicable when the issues for determination affect

only rights and claims personal to the parties....").

**10.** Although the Court of Criminal Appeals reversed the sentence of death, the intermediate appellate court remanded the case for a new sentencing hearing and "commended" to the trial court *State v. Harris*, 919 S.W.2d 323, 331 (Tenn.1996), which allows the State to establish new aggravating factors at a subsequent capital sentencing hearing. Because it is our view that the death sentence in this case was not disproportionate, we need not discuss the propriety of the Court of Criminal Appeals' ruling.

sence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. *Id.* This Court must also consider the following factors about a defendant: "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Id.* (citing *Bland,* 958 S.W.2d at 667; *State v. Bane,* 57 S.W.3d 411, 428–29 (Tenn.2001)).

There was proof that the Defendant accompanied Sudderth and others to the victim's residence during the early morning hours of April 7, 1998. According to one witness, the Defendant entered the residence, forced the victim from his bedroom, and directed him to the outside. Shortly thereafter, shots were fired. There was medical testimony that the victim was shot first in the groin, rendering him nearly helpless. By the time he reentered the residence, he had suffered two additional wounds, both of which were mortal. By all appearances, the killing was motivated by a desire to seek vengeance for the rape of Sudderth's girlfriend, Porter. Several witnesses testified that Sudderth had offered a $10,000 "bounty" on the head of the rapist. Other evidence established that the Defendant expressed a need and desire for the money. He had no other means of supporting himself. These circumstances suggest a premeditated act of vengeance. The Defendant had previously been convicted of a felony involving violence, admitting that he had "crushed in" the face of the robbery victim. He expressed no remorse for the victim's death.

 When conducting a proportionality review, this Court need not " 'search for proof that a defendant's death sentence is perfectly symmetrical, but [must] identify and ... invalidate the aberrant death sentence.' " *State v. Stevens,* 78 S.W.3d 817, 842 (Tenn.2002) (quoting *Bland,* 958 S.W.2d at 665). With these considerations in mind, it is our view that this case is not " 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.' " *Davis,* 141 S.W.3d at 620 (quoting *Bland,* 958 S.W.2d at 668). Nor is it our view that the sentence of death was imposed in any arbitrary fashion. *See* Tenn.Code Ann. § 39–13–206(c)(1)(A) (1997).

The jury in this case, properly instructed in the law, imposed a sentence of death based upon its finding that the Defendant had been previously convicted of a felony involving violence to the person. This Court has recognized that the prior violent felony aggravating circumstance is "more qualitatively persuasive and objectively reliable than others." *State v. Howell,* 868 S.W.2d 238, 261 (Tenn.1993). In fact, we have upheld the sentence of death where the prior violent felony aggravating circumstance was the sole aggravating circumstance. *See State v. Cole,* 155 S.W.3d 885, 907 (Tenn.2005); *State v. Dellinger,* 79 S.W.3d 458, 475 (Tenn.2002); *State v. McKinney,* 74 S.W.3d 291, 314 (Tenn. 2002); *State v. Chalmers,* 28 S.W.3d 913, 920 (Tenn.2000); *State v. Keough,* 18 S.W.3d 175, 184 (Tenn.2000); *State v. Adkins,* 725 S.W.2d 660 (Tenn.1987).

The Court of Criminal Appeals appeared to be particularly concerned with the "quality of the victim." In comparing the facts of this case to others where the death penalty was imposed, that court observed that the victim in this case was much less sympathetic. In our view, factors about the victim, such as his age or his physical or psychological condition are relevant, but should not preclude the death penalty on grounds of disproportionality.

Under these circumstances, it is our view that the Court of Criminal Appeals erred by finding that the sentence of death was disproportionate. Accordingly, the State may again seek a sentence of death upon remand.

## CONCLUSION

In summary, we hold that the test in *McDaniel* is sufficient to allow the trial court to properly evaluate the admissibility of expert testimony on the reliability of eyewitness identification. To the extent that Coley holds otherwise, it is overruled. It is our view that the erroneous exclusion of the expert testimony on eyewitness testimony cannot be classified as harmless in this case. In consequence, the case must be remanded for a new trial. The *Momon* issue is moot. Finally, because it is our view that the Court of Criminal Appeals erred by finding that the death sentence was disproportionate in this case, the State is free upon remand to pursue a sentence of death.

It appearing that the Defendant is indigent, the costs of the appeal are taxed to the State of Tennessee.