IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2011

## ISAAC EUGENE JONES, III v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 272063    Jon Kerry Blackwood, Judge**

---

**No. E2010-02115-CCA-R3-PC - Filed August 17, 2011**

---

The Petitioner, Isaac Eugene Jones, III, appeals as of right from the Hamilton County Criminal Court's denial of his petition for post-conviction relief. The Petitioner was convicted of second degree murder and sentenced as a Range I, standard offender to 25 years in the Tennessee Department of Correction. In this appeal as of right, the Petitioner contends that trial counsel was ineffective for failing to ensure that he was given the opportunity to testify at trial and for failing to object to his statement in which he said that he had molested his cousin. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Mike A. Little, Chattanooga, Tennessee, for the appellant, Isaac Eugene Jones, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and M. Neal Pinkston, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On direct appeal, this court affirmed the Petitioner's second degree murder conviction. State v. Isaac Eugene Jones, III, No. E2006-00983-CCA-R3-CD, 2008 WL 65322 (Tenn. Crim. App. Jan. 7, 2008), perm. app. denied (Tenn. June 23, 2008). Although the facts of the Petitioner's case have already been discussed in this court's opinion affirming his

conviction, we will provide the following factual summary to establish context for the issues before this court.

This case arose from the shooting death of Officer Julie Jacks of the Chattanooga Police Department. On May 5, 2002, the Petitioner, who had been living with his grandparents, exhibited peculiar behavior. His grandfather took him to Memorial Hospital for an evaluation. The Petitioner had a family history of mental illness; however, the doctor at Memorial Hospital was not informed of this history. Instead, the Petitioner only complained of abdominal pains and not feeling "right." The Petitioner also stated that he had smoked some bad marijuana. Based upon this, the Petitioner was released. The Petitioner's aunt, Tina Carter, took him home with her. Ms. Carter described the Petitioner as "very talkative," "fidgety and erratic." Ms. Carter asked her ex-husband, Robert Curtis Carter, Jr., to stay at the house with them because she was concerned about the Petitioner's behavior. Mr. Carter stayed up with the Petitioner, who did not sleep all night.

On May 6, 2002, Mr. Carter took the Petitioner, who was pursuing a degree as a pharmacy technician, to Chattanooga State so that he could take a final exam. While at Chattanooga State, the Petitioner exhibited peculiar behavior outside of his usual personality and was not dressed in his normally tidy appearance. After the Petitioner turned in his exam, he spoke with Dr. Nancy Watts, the director of the pharmacy technician program. Noticing that the Petitioner was acting strangely, Dr. Watts called for campus security. When campus security arrived, the Petitioner attempted to run but was apprehended. Dr. Watts told the officers that she believed the Petitioner "was a danger to himself and others." An officer from the Chattanooga Police Department took the Petitioner to Parkridge Medical Center for a mental evaluation.

Ms. Carter met the Petitioner at the hospital and stayed with him while he awaited treatment. The Petitioner, who was handcuffed but agitated, yelling, and still exhibiting peculiar behavior, was kept waiting in the hallway for several hours at the hospital. The Petitioner was eventually placed in a private room, and the handcuffs were taken off in order to allow the Petitioner to give a urine sample. While in the private room, the Petitioner's pants fell down. Ms. Carter attempted to help the Petitioner, but the Petitioner kept saying that he could not pull them back up. The Petitioner, wearing only socks, boxer shorts, and a t-shirt, ran from the room and left the hospital. The hospital reported the Petitioner's absence, and Officer Jacks, who was working at a nearby traffic accident, responded to the call.

While attempting to apprehend the Petitioner, Officer Jacks wrestled with the Petitioner and was thrown to the ground. The Petitioner took Officer Jacks's weapon and shot her seven or eight times before sliding the gun into the sewer. Officer Matthew Rogers

came to the scene and found the Petitioner standing over Officer Jacks and looking at her. The Petitioner ran but was tackled, handcuffed, and maced. The Petitioner was heard yelling, "I hope I killed the [b***h]. I'm going to kill all of ya'll. I'm going to make sure I get all of ya'll. I hope the [b***h] is dead."

Officer John Spain took control of the Petitioner and placed him in a police car. While waiting to be taken to the police department, the Petitioner was recorded by Officer Spain. The Petitioner made statements concerning "salt in the water," his grandfather having the "keys to heaven," and other incoherent topics. Once at the station, the Petitioner stated he was left-handed, that he had the Human Immunodeficiency Virus (HIV), and that he had molested his cousin. These statements were later deemed false. The Petitioner was also spitting and repeatedly questioning Officer Spain about the time. The Petitioner eventually said, "I give up" before he became docile. The Petitioner gave a statement and was then taken to Memorial Hospital for an evaluation. The Petitioner was "alert [and] oriented" and did not exhibit any signs of "drug-induced or alcohol-induced psychosis." The Petitioner was transported to the Hamilton County Jail, where the Petitioner resumed his strange behavior.

The Petitioner was placed in a suicide cloak but "was usually nude in his cell" and was seen "flushing his jail uniform . . . wash[ing] his hair in the toilet, and . . . constantly smear[ing] feces . . . in his hair . . . and on his body." The Petitioner was diagnosed with schizophrenia and given medication. After the Petitioner received medication, his behavior improved.

The Petitioner was examined by Dr. Pamela Auble, a psychologist, and Dr. George Woods, a psychiatrist and forensic psychologist. The Petitioner told both doctors that he heard voices, saw demons, that he sensed a demon in Officer Jacks, and that he believed he had to kill the demon before it killed him. Both doctors testified at trial that the Petitioner was in the midst of a psychotic event when he shot Officer Jacks. They related that given the Petitioner's family history of mental illness, the Petitioner was at an increased risk for mental illness. They explained that the Petitioner's actions before May 6 were consistent with a prodromal phase, where the schizophrenia symptoms begin to manifest. They said that the Petitioner's medication managed his schizophrenic symptoms but did not eliminate the symptoms of schizophrenia, a lifelong disease requiring daily medication.

The Petitioner was charged with first degree murder. Following the presentation of the evidence, the jury convicted the Petitioner of the lesser-included offense of second degree murder. After the Petitioner's convictions were affirmed on appeal, the Petitioner filed a timely petition for post-conviction relief on June 1, 2009. Following the filing of an amended petition for post-conviction relief, an evidentiary hearing was held on September 15, 2010, at which the Petitioner and trial counsel testified.

The Petitioner testified that he was currently taking anti-psychotic medication. He said that he had not been diagnosed with any type of mental illness prior to his commission of the offense and that he started taking medication after he was incarcerated. He said that he believed that his mental illness began around the time that he committed the offense.

The Petitioner testified that he was represented by three attorneys at trial. He said that lead counsel told him that he only had two decisions to make regarding his case. He said that she told him that he needed to decide whether he would go to trial and that if he wanted to have a trial, he would then need to decide whether he would testify at trial. He said that prior to trial, he had extended discussions with counsel regarding his right to testify and the fact that it was his decision to make. He said that they discussed the "pluses and the minuses" of him testifying. He said that counsel told him that they would have a mock trial in which he would be put on the stand and questioned. He said that for some reason, they never conducted the mock trial as they had planned. He said that at the time that they were supposed to have the mock trial, he had not told counsel that he had made a decision as to whether he would testify.

The Petitioner testified that he did not really have any questions about his right to testify but that as the trial progressed, he felt that he should testify. He stated that he was not able to discuss his concerns with counsel because "[a] lot was going on." He said that counsel never came to him during trial and asked him whether he had decided to testify. He said that if he were asked at any time during the trial or at the close of the trial if he wanted to testify, he would have told his attorneys that he wanted to testify. He stated that he decided that he wanted to testify during the trial because he felt that he needed to rebut certain issues that had been brought out throughout the trial.

The Petitioner said that the trial court admitted a statement in which he said that he had molested his cousin. He said that this statement was "secretly recorded" by an officer "from the time period where Sergeant Spain had arrived on the scene of the crime up until right before [he] was about to give [his] statement to the police." He testified that he knew that his admission regarding his cousin would be introduced through his tape-recorded statement but that he did not think that the State would "keep bringing that issue up as if it had some truth to it or whatever." He said that he felt that he needed to tell the jury that he had not molested his cousin.

The Petitioner said that he also wanted to testify in order to rebut the implication that he was a gang member. He said that a defense witness had testified during cross-examination that he was affiliated with a gang. He said that his attorneys had advised him that if he testified, his alleged gang affiliation might be an issue in the trial. He said that he believed that the statement was admitted even though he had not yet testified because a

defense witness had described him as "dutiful" and "gentle." He said that the State was allowed to cross-examine the defense witness on this characterization of him.

The Petitioner stated that had he been offered the opportunity to testify at trial, he would have testified about the day prior to the commission of the offense, May 5, 2002. He explained that he could not testify relative to the entirety of the events on the day that he killed the officer because his memory of May 6, 2002 was "sketchy." He said that he only remembered "bits and pieces" and places that he went on May 6. He said that he remembered "going to school" to take his final exam, "leaving class," "sitting handcuffed on a bench," "being taken to the hospital," and "leaving the hospital." He said that he could not remember whether he had actually taken his final exam while he was at school. He said that he could not remember anything after he left the hospital on May 6.

The Petitioner said that he would have testified that he remembered that he was "behaving in an odd way" on May 5. He said that he was living with his grandparents at the time and that he told his grandfather that he "wasn't feeling himself." He said that his grandfather told him that he had been "doing some things that [he] didn't usually do." He said that his grandfather asked him what was wrong and that he told his grandfather that he thought "something bad" had been in the marijuana that he had smoked a couple of days earlier. He said that he spent the night at his aunt's house on May 5 and that his aunt's ex-husband took him to school on May 6. He said that he remembered leaving the hospital on foot but that he did not remember anything after he left the hospital. He said that he did not remember fighting with the officer, firing a gun, being taken into custody, or telling anyone that he had molested his cousin.

The Petitioner said that if given the chance, he would have testified regarding his alleged gang affiliation and explained why he had been classified as a gang member. He said that when he was 14 and living in California, the police caught him with a gun. He said that he lived in a gang area and that because he was caught with a gun in that area, the police thought he was a "new member of that gang." He explained that it was common for teenagers to carry weapons for protection in that area even if they were not gang members. He said that he did not normally carry a weapon but that he was carrying the gun for someone who had "just got out of prison and . . . wanted [him] to hold a gun for them."

The Petitioner testified that he would have also told the jury about his performance in school. He said that he was in the pharmacy technician program and that he was on the dean's list his first semester. He said that in his second semester, he made an A, a B, and a C even though he did not take the final exam. He said that he was working while he was in school but that he had quit his job a week or two before his final exams because he "wanted

to focus on [his] clinical rotations that [he would] have to complete in order to finish the pharmacy technician program."

On cross-examination, the Petitioner stated that he saw the videotape evidence and that he heard his recorded statements that would be admitted at trial. He said that his defense team hired experts to examine him in order to determine whether they should pursue an insanity defense. He said that he did not really make any suggestions to his attorneys because he had never been on trial for something as serious as murder. He admitted that while he was living in California he was charged with possession of a concealed weapon and possession of stolen property. He said that while those charges were not as serious as the present murder charge, he had experienced the court system before.

The Petitioner admitted that issues regarding his mental health and his troubled upbringing in California were mentioned throughout the trial "[t]o some degree." He admitted that his aunt testified on his behalf at trial and that she told the jury that she did not believe that the Petitioner had molested her daughter. He said that his aunt also testified about the events of May 5 and 6 because she was with him the night of the 5th and at the hospital before he escaped on the 6th. He said that even though she testified as to those events, he believed that testimony from him would have also been beneficial. He said that he did not believe that he was prohibited from testifying because "everything that came out that they said that would come out with [him] taking the stand already had came out." He said that he could not say whether his testimony would have changed the outcome of his trial but that he could have defended himself if he had been offered the opportunity to testify.

Lead counsel testified that she had been a licensed attorney in Tennessee since 1981. She said that she had represented several other Petitioners who had death penalty cases before she accepted the Petitioner's case and that she had participated in more than 50 homicide cases. She stated that her representation of the Petitioner lasted for approximately three years.

Lead counsel testified that the Petitioner "was not a normal client" and that in her opinion, he was "actively psychotic." She stated that when she first met the Petitioner, he was unclothed and had "urinated and smeared feces everywhere." She stated that she was able to establish a "rapport and some trust pretty early on" even though he was still struggling with hallucinations. She said that at first, it was hard to communicate with the Petitioner but that once he was medicated, "his behavior changed and [she] could tell [that] the medication was taking effect." She said that as time passed, it was hard to "differentiate with him what he had learned from [them] through the discovery material and what he actually remembered."

Lead counsel stated that she and another attorney handled the guilt-innocence portion of the Petitioner's trial, while the third attorney on the team handled the mitigation portion. She explained that their strategy was to "front-load mitigation" because "there was no question" that the Petitioner had killed the police officer. She said that while the Petitioner's tape-recorded statement presented some problems, she thought the Petitioner's statements were indicative of a psychosis and generally supported his insanity defense. She stated that she kept the Petitioner informed of the investigation of his case but that the Petitioner's "ability to assist [them] was limited." She stated that she informed him of his constitutional rights and that she told him that he had to decide for himself whether he would testify or not.

Lead counsel testified that the testimony regarding the alleged molestation of the Petitioner's cousin was "a total surprise" but that the Petitioner's aunt testified that she did not believe that the Petitioner had molested her daughter. She admitted that she did not object to the recording in which the Petitioner admitted molesting his cousin because she felt that the tape would be "more helpful" to them than anything because "even if it did mention some things that might be considered bad," his statements were "just part of the ramblings that showed his psychosis at the time." Relative to the Petitioner's alleged gang affiliation, she said that through their investigation, they discounted that testimony after talking with members of the Petitioner's family. She said that all of the Petitioner's cousins were gang members but that they told her that the Petitioner was "too strange for anybody to want to have him in a gang." She said that they learned that the Petitioner was "very isolated" and "was always considered really really strange." She said that the Petitioner went to school, had a job, and "made very very good grades." She said that they fought to keep his alleged gang affiliation out of the testimony at trial but that it was ultimately admitted over her objection. She said that they also fought to keep out his alleged marijuana habit because they believed that his actions were not related to his smoking marijuana but that his actions were more indicative of a "schizophrenic break in reality." She said that his history was indicative of "somebody who was very very bright but was starting to really kind of spin out of control."

Lead counsel testified that she spoke with the jurors after the trial and that she learned that one juror originally thought that the Petitioner was not guilty by reason of insanity. She said that most of the jurors felt that the Petitioner "definitely had mental health problems" but that they compromised and convicted the Petitioner of second degree murder.

Lead counsel testified that she remembered telling the Petitioner that he had a right to testify at trial. She said that she did not feel like it would have been in his best interest to testify because they were presenting an insanity defense and because he had "trouble at some point differentiating between what he had been told and what he actually remembered." She said that she told him that if he were to testify, that he needed to "testify to what he

remembered, not what somebody had told him." She said that she could not remember whether she told him that she did not think that he should testify but that "when the time came for him to make a decision, [they] didn't talk to him about it." She said that she could not remember whether she mentioned anything to him about testifying during the trial.

On cross-examination, lead counsel testified that they discussed his constitutional rights, specifically his right to a trial and his right to testify. She said that they advised him to accept a 40-year plea agreement but that the Petitioner ultimately rejected the offer after they discussed the decision "[a]t length." She said that they discussed his right to testify but that she did not talk to him about testifying as the trial was progressing. She said that she just did not even think to have the discussion. She said that she had "never not done that before, but [that she] didn't do it in [the Petitioner's] case." She explained that normally they would have been talking to the Petitioner about his decision to testify toward the end of the trial but that they were "really pressed on time and trying to figure out what to do next." She said that when they made decision to close the proof, all three of them were "huddled together in the courtroom," while the Petitioner was "back in the holding cell."

Lead counsel stated that prior to trial, the Petitioner had not made a decision about testifying. She said that she had explained the disadvantages and advantages of testifying. She admitted that the issues she thought might come out through his testimony came out through trial anyway but stated that she felt that they "had limited it and minimized it." She said that she felt that those issues would be "emphasized if he were on the witness stand." She said that she and the other attorneys had discussed the issue of him testifying and had agreed that the Petitioner should not testify. She said that as they were walking back to the office after the jury had reached a verdict, she realized that the Petitioner had never actually decided that he would not testify.

Lead counsel admitted that the testimony regarding the gang affiliation was admitted through their defense witness. She said that she did not intend for that information to come out at trial and that she objected to that characterization of the Petitioner.

Following the evidentiary hearing, the post-conviction court found that counsel was deficient for failing to ensure that the Petitioner was offered an opportunity to exercise his right to testify and by failing to request a Momon v. State, 18 S.W.3d 152 (Tenn. 1999) hearing. The court also found that counsel was deficient for failing to object to testimony concerning the Petitioner's alleged molestation of his cousin. The court ultimately held that the Petitioner had failed to establish his claims of prejudice by clear and convincing evidence. The court found that the Petitioner's testimony "would have had little impact on a jury in which the [Petitioner's] theory was insanity." The court stated that the "molestation

issue was addressed and refuted by another witness" and that the "gang affiliation accusation occurred several years before this event and while [the Petitioner] was a teenager."

## ANALYSIS

The burden in a post-conviction proceeding is on the petitioner to prove the factual allegations to support his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); See Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). If the petitioner proves his allegations by clear and convincing evidence, the trial court must then determine whether trial counsel was ineffective according to Strickland v. Washington, 466 U.S. 668, 687 (1984). Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. Strickland, 466 U.S. at 697. In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that "there is a reasonable probability" that but for the substandard performance, "the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In determining whether trial counsel's performance was deficient, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). "[D]eference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). An attorney's performance must be measured against the general standard of whether the services rendered were "within the range of competence

-9-

demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

## I. Momon hearing

The Petitioner contends that trial counsel was ineffective because she failed to protect his right to testify on his behalf pursuant to Momon v. State, 18 S.W.3d 152 (Tenn. 1999). The Petitioner asserts that if he had testified, the outcome of the trial would have been different because he would have been able to explain his alleged gang affiliation, rebut the allegation that he had molested his cousin, and explain his mental status at the time of the crime. The Petitioner citing the dissent in Momon, further asserts that harmless error review of a Momon violation is not appropriate. The State responds that the Petitioner is not entitled to relief because he has failed to show that he was prejudiced by counsel's deficient performance.

"[T]he right of a criminal defendant to testify in his or her own behalf is a fundamental constitutional right." Id. at 161. In Momon, the Tennessee Supreme Court recognized the ability of a defendant to waive this right. The court established a procedure for questioning the defendant regarding this decision at his trial designed to "protect the fundamental right of the accused to testify in a criminal trial and to ensure that any waiver of that right was personal, knowing, and voluntary." State v. Copeland, 226 S.W.3d 287, 304 (Tenn. 2007). It is undisputed that the Petitioner was not given an opportunity to waive his right to testify on his behalf pursuant to Momon and that counsel was deficient by failing to ensure that the Petitioner's right to testify was protected.

Once a Momon violation has been established, the State must prove that the violation was harmless beyond a reasonable doubt. Momon, 18 S.W.3d at 167. We acknowledge the Petitioner's argument that harmless error review of this type of violation is not appropriate. However, the law is well-settled in Tennessee that violations of this type should be subjected to harmless error review. Moreover, when the denial of this right is raised as claim of ineffective assistance of counsel, the petitioner must still show that but for counsel's error in protecting this right to testify, "there is a reasonable probability" that "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In keeping with the reasonable probability standard, it is still helpful to consider the factors applicable when determining whether the violation was harmless beyond a reasonable doubt on direct appeal.

-10-

On direct appeal, when faced with a <u>Momon</u> violation, reviewing courts should consider "(1) the importance of the defendant's testimony to the defense case; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; [and] (4) the overall strength of the prosecution's case." <u>Id.</u> at 168; <u>accord</u> <u>State v. Posey</u>, 99 S.W.3d 141, 149 (Tenn. Crim. App. 2002). These factors are "merely instructive and not exclusive considerations." <u>Momon</u>, 18 S.W.3d at 168.

On direct appeal, this court concluded that the Petitioner's right to testify was "infringed upon" but ultimately held that the error was harmless. <u>Jones</u>, 2008 WL 65322, at *7. Here, the Petitioner alleges that his testimony from him concerning his alleged gang affiliation, his alleged molestation of his cousin, his background, and his mental state would have contributed to his defense.

### A. Alleged gang affiliation

The admission of testimony regarding the Petitioner's alleged gang affiliation was a hotly contested issue at trial. As such, the testimony that was admitted regarding this issue was extremely limited. On cross-examination of Dr. Woods, the State asked,

| | |
|---|---|
| State: | Did you, did you consider information that you had that he was affiliated in a gang in Los Angeles? |
| Witness: | Yes. |
| State: | Did you - - |
| . . . . | |
| State: | When he was living out there when he was 14? |
| Witness: | Yes. |
| State: | Before he came to Tennessee? |
| Witness: | Yes. |
| State: | Did you factor that in in any way? |
| Witness: | Yes. |
| State: | And concluded it was of no importance? |
| Witness: | To him developing paranoid schizophrenia, that's correct. |
| State: | For his conduct? |

Witness:    Well, I believe that his conduct derived from his schizophrenia.

State:      Okay. And not from [his gang affiliation]?

Witnes:     That's correct.

On re-direct examination, defense counsel asked,

Defense:    Okay. Now, Mr. Cox said something about - - asked you if you had received information that [the Petitioner] was affiliated with any gang or gang member. Have you found or been provided by the prosecution, the [Petitioner], or anyone else of any records or information of any gang activity of [the Petitioner] after the age of 14?

Witness:    No.

Considering the limited nature of this line of testimony, we do not believe that further testimony from the Petitioner on this issue would have been beneficial for the defense. The Petitioner stated that he would have testified that he was arrested in an area of heavy gang activity for carrying a weapon for someone who had "just got out of prison and . . . wanted [him] to hold a gun for them." If this testimony had been presented, the jury would have heard that the Petitioner had prior experience with a weapon. While the testimony would not have been cumulative, the Petitioner would have been heavily cross-examined on an issue regarding something that occurred when he was 14-years-old, 7 years before he committed the instant offense at the age of 21. We believe that testimony from the defense expert that he had considered this alleged affiliation but ultimately rejected its importance in his overall evaluation of the Petitioner's state of mind at the time of the crime neutralized the harmful effect of the alleged gang association. Additionally, there was no testimony to corroborate the Petitioner's explanation for his gang affiliation. If anything, the Petitioner would have brought more attention to the fact that he had been affiliated with a gang at one point in his lifetime. While counsel testified that witnesses told her that the Petitioner was too strange to be involved in a gang, these witnesses were not presented at the evidentiary hearing. Given the strength of the State's case and the limited importance of this issue to the trial, we do not believe that the Petitioner's testimony would have aided his defense.

B. Alleged molestation of the Petitioner's cousin

-12-

Likewise, the Petitioner's testimony regarding his alleged molestation of his cousin was unnecessary for his defense. Testimony regarding the Petitioner's alleged molestation of his cousin was limited and refuted by defense witnesses. The Petitioner was recorded by Officer Spain after he was arrested. In this recording, the Petitioner said that he molested his cousin when he was 21-years-old. When confronted with the fact that he was 21 at the time of the interview, the Petitioner said, "I know I'm 21 now." This testimony was later rebutted by Ms. Carter, who testified during the defense proof that she did not believe that the Petitioner had molested her daughter. Dr. Woods was asked about this testimony during his cross-examination, the State asked,

| State: | So you're pretty sure [the Petitioner] didn't just get mad because he blew his test and his teacher rebuffed him. |
|---|---|
| Witness: | Pretty sure. |
| State: | Okay. What about this - - you didn't mention this either, the, his apology for molesting [his cousin]? |
| Witness: | I have no evidence that that actually happened. |
| State: | Pardon? |
| Witness: | I have no evidence that, that a molestation actually occurred. I know that he said that in the same way that he said he was left-handed, but I have no evidence that that actually occurred. |
| State: | Would that not be evidence, that he said it? |
| Witness: | Well, we can't take that evidence as true and then we can't pick and choose the evidence that we want in terms of him saying - - I'm just saying I have no evidence that that actually occurred. |
| State: | Well, what evidence do you have of him seeing demons? |
| Witness: | First of all, I didn't say that he saw demons. I said he saw real people that took the - - that he felt took the shape of demons. If we, in fact, are accepting that this molestation occurred, I'm not sure what conclusions you've drawn from that. Let's accept that it did occur. |
| State: | Okay. |
| Witness: | What conclusion are you drawing from that? |
| State: | Well, there could be lots of conclusions, but it's your - - you're the one that's looking at his overall makeup. One conclusion |

might be that when he got in that doctor's office, he was afraid it was going to be discovered, that would be one conclusion.

Witness:    Got in what doctor's office?

State:      At Parkridge Hospital. I mean, that would be one. There could be others. But I'm asking, I'm just merely asking you if you considered it?

Witness:    I did consider it.

State:      You did not?

Witness:    I did.

State:      You did.

Witness:    Yes.

State:      And you just rejected it as not being true?

Witness:    No. No. I said I did not have evidence that it occurred, and I certainly don't consider it to be a causative factor in him developing schizophrenia.

State:      Okay. But it could have been a causative factor for behavior?

Witness:    Perhaps.

We do not believe that evidence from the Petitioner on this issue would have been important for the defense case. Here, at issue in this trial was whether the Petitioner, who was suffering from schizophrenia, had the mental capacity to form the requisite intent to kill the victim, not whether he molested his cousin. Testimony from the Petitioner would have been cumulative because the Petitioner's aunt testified that she did not believe that her daughter had been molested. His testimony would not have lessened or affected the State's proof that he had killed the victim. While the implication that the Petitioner had molested his cousin was prejudicial, the Petitioner's recorded statement in which he made several bizarre claims was further proof that he was not thinking clearly when he shot the victim, thereby strengthening his defense of insanity. Therefore, we do not believe that the Petitioner's testimony would have added anything to his defense that was not already supplied by the other witnesses.

C.  The Petitioner's background

-14-

We believe that testimony from the Petitioner regarding his background was important. Several witnesses testified regarding the Petitioner's success at school. Dr. Watts testified that the Petitioner had been in her 12-month program for approximately 9 months. She said that he was "a very good student" that made "all A's and B's." She stated that the Petitioner had received an award on April 30, 2002. Patricia Cross, an instructor for the pharmacy technician program, testified that the Petitioner was a good student. Kenya Ervin testified that she met the Petitioner in August 2001 when they were in the pharmacy technician program at Chattanooga State. Ms. Ervin said that the Petitioner did well on his tests and that he had received an award prior to the final exam. She said that the Petitioner was also working while they were completing the program and that the Petitioner enjoyed his job. Testimony from Dr. Watts, Ms. Cross, and Ms. Ervin would have corroborated the Petitioner's account of his background. However, the case against the Petitioner was strong, and the Petitioner would have faced a vigorous cross-examination had he testified. Accordingly, we believe that further testimony from the Petitioner on these points would not have been more beneficial than testimony from these seemingly objective witnesses.

### D. Mental state

We also believe that testimony from the Petitioner regarding mental status and his thoughts, memories, and actions before, during, and after the crime would have been important. Several witness testified regarding the fact that the Petitioner's behavior on the day of the victim's death was out of character with his background. Additionally, Dr. Auble and Dr. Woods testified about the Petitioner's mental status.

Dr. Watts described the Petitioner as a "[v]ery polite" but "very quiet and timid student" who "would rarely speak unless spoken to." She said that on the day of his final exam, May 6, 2002, the Petitioner entered the classroom and greeted everyone with a jovial "Good Morning." She said that it was "unusual for him to speak to the class" especially when the final exam was in progress. She stated that the Petitioner was wearing "loose and baggy" pants that were "hanging down on his hips," which was a "little bit different" for him. She told the Petitioner to pull his pants up, and he complied. She said that approximately ten minutes later, the Petitioner left the classroom, claiming that he had "aced" his exam. When the Petitioner moved toward her to hug her, Dr. Watts stepped backward and rebuffed the Petitioner. She stated that when she checked the Petitioner's exam, she found that the Petitioner had written his name on the exam but had not answered any of the questions.

When Dr. Watts saw the Petitioner again in the hallway, the Petitioner's behavior and body language was "much more agitated and exaggerated." The Petitioner also said things that "absolutely made no sense." She stated that from her experience, she believed that the Petitioner was "in psychosis." She stated that the Petitioner was "spitting violently" and cursing during their conversation. She said that she told the chief of campus security that the Petitioner was "a danger to himself and to others." She said that the Petitioner was placed in a patrol car and that when one of his family members arrived, he began "screaming like a wild animal."

Sandy Kluttz, the Dean of Student Life and Judicial Affairs at Chattanooga State, testified that after the Petitioner left the exam room, he was found later in the hallway. She said the Petitioner was "very loud and flailing and wailing," was talking about "biblical things and being saved and Heaven," and was also using obscenities and telling them that he had "smoked a little grass over the weekend" and that morning. She said that when the campus security officers arrived, the Petitioner kicked his shoe off and "jumped over the table" or "one of the chairs that was there." She said that the Petitioner was also spitting in a "methodical" way to the right and then to the left.

Ms. Cross testified that the Petitioner was "very quiet, timid, very reserved" and did not interact with the other students. She said that on the day of the final exam, the Petitioner came into the classroom and yelled, "Good morning!" She said that the Petitioner normally dressed "neat, very neat" but that on that day, his pants were "down below his waist." She said that approximately five minutes after he received his exam, he brought it to her and said he was finished. However, the Petitioner did not answer any of the questions. She said that when the campus security officers came, the Petitioner yelled, "[B]lasphemy! Blasphemy! Blasphemy!" Ms. Cross stated that she was "totally shocked" by the Petitioner's behavior and that she thought he must have been on "some kind of drug or something" because she had "never seen him upset in any way."

Ms. Ervin said that the Petitioner was always "very pleasant," "very quiet," and "stayed to himself." She said that the Petitioner was always "neat in appearance" but that he always wore a "black hooded sweat shirt." She said that as the year progressed, the Petitioner "started opening up and talking to [her] more." She said that "maybe three or four weeks before graduation" she "started noticing some changes in him." She said that at times, the Petitioner was "very talkative, energetic" but that he was "agitated" at other times. She said that the Petitioner told her he had quit his job, which she thought was odd because the Petitioner "enjoyed his job and always wanted to go to it." She said that on the Friday before their final exam, the Petitioner was "a little bit more talkative" and "had a lot of energy,"

which was unusual. She said that the Petitioner was "clingy" and acted like he needed to be "around someone." She said that on the day of the exam, she arrived after the Petitioner had already left the exam room but that she heard him "screaming in the hallway" while she was trying to take her test. She said that given the "events that led up to that day," she was "worried and concerned about him because of the differences in his actions." She said she had "start[ed] to wonder if he was having a breakdown or some mental issue."

Lieutenant Tommy Hayes, a campus security officer for Chattanooga State, testified that he helped detain the Petitioner at the school and that when he arrived, the Petitioner was "[f]idgety," "repeated[ly] spitting," and would "just scream out." The Petitioner said that "he had smoked some bad marijuana." Lieutenant Hayes said that the Petitioner's behavior was not indicative of someone who had smoked marijuana. Chief Napoleon Williams, the chief campus security officer for Chattanooga State, testified that he arrived when the Petitioner was being handcuffed by Lieutenant Hayes and Lieutenant Parks. He stated that he called 9-1-1 and reported a "lunancy," meaning that someone was "disruptive and not normal" on the campus. He stated that the Petitioner continued to spit when he was placed in the patrol car.

Reverend Walter Cross of the Washington Hills United Methodist Church testified that when the Petitioner first moved to Tennessee, the Petitioner was "sort of quiet" and "very calm." He stated that as time passed, their relationship grew, and he found that the Petitioner was "very warm and compassionate." He said that the Petitioner became "more engaged." He said that the Petitioner's grandmother was "critically ill" around the time that the shooting occurred. He said that the Petitioner became "noticeably different" in the weeks leading up to the shooting. He said that the Petitioner spoke with him on May 5, 2002, which he found unusual because the Petitioner had never spoken to him individually before. The Petitioner told him that, "he had been having headaches and he had been hearing voices" but that "the voices were gone and he was all right now." Reverend Cross said that the Petitioner began crying "uncontrollably" and kept saying "the same thing over and over again." Reverend Cross said that he took the Petitioner home and that while at the house, the Petitioner began sobbing and "physically shaking" while he was smiling, crying, and repeating, "everything's all right now." Reverend Cross said that the family was under a lot of turmoil because of the Petitioner's grandmother's illness. On cross-examination, Reverend Cross stated that the Petitioner told him that the "voices" were saying "bad things."

Gwen Davis, the Petitioner's Sunday school teacher, also testified regarding the Petitioner's change in behavior. She said that approximately two months before the shooting, the Petitioner was "not as focused" and was "withdrawn," like he was "struggling with

something." The Petitioner was not as "neatly dressed as he always was" and not as "focused." The Petitioner's family members, Priscilla Jones, Tina Carter, and Robert Carter, Jr., also testified in-depth concerning the Petitioner's change in behavior.

Donna Smith, a patient at Parkridge Medical Center, testified that the Petitioner "looked scared" as he was lying on the gurney and that "his eyes were just, just looping everywhere." Christine Saunders, a nurse at Parkridge Medical Center, testified that the Petitioner was "a bit agitated" and was "yelling a bit" when he was questioned.

Dr. Auble and Dr. Woods testified at length regarding the Petitioner's mental state. Given the fact that the Petitioner's classmates, teachers, and family members also testified regarding his peculiar behavior prior to the commission of the offense, we believe that his testimony on these issues would have been cumulative. Had the Petitioner testified, his assertion that he was not thinking clearly and could not remember the events of the day would have been corroborated by these witnesses. However, the Petitioner would have been heavily cross-examined on his lack of memory and his actions that day. Additionally, the State's case against the Petitioner was strong. Counsel submitted several witnesses and medical evidence regarding these issues and presented a lengthy and well-rounded insanity defense on the Petitioner's behalf. Given their already thorough defense, we do not believe that the Petitioner's testimony would have been beneficial.

With the above considerations in mind, we conclude that the Momon violation was harmless beyond a reasonable doubt. Accordingly, we also conclude that the Petitioner has failed to prove that if he had testified, there is a reasonable probability that the result of the proceeding would have been different.

II. Counsel's failure to object

The Petitioner further contends that trial counsel was ineffective for failing to object to testimony regarding his statement that he had molested his cousin. The State responds that the issue concerning the testimony about the Petitioner's cousin is waived because the Petitioner "failed to cite to relevant authority, failed to cite to relevant portions of the record, and . . . failed to develop his argument." The State further responds that the Petitioner is not entitled to relief because he has failed to show that he was prejudiced by counsel's alleged error.

-18-

The State is correct in its assertion that the Petitioner failed to fully brief this issue. The Petitioner's argument on this issue is three sentences. While the Petitioner provided one citation to the record, he failed to cite any authority or develop his argument in this section of the brief. Rule 10(b) of the Rules of the Court of Criminal Appeals of Tennessee provides, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."

Regardless of waiver, the Petitioner has failed to establish how trial counsel's failure to object to this statement was deficient or that the failure to object resulted in prejudice to his trial. The testimony elicited without objection from defense counsel concerned an issue that was not relevant to the Petitioner's guilt or innocence. As previously stated, if anything, this testimony was further proof in support of the Petitioner's assertion that he was not thinking clearly on the day that he committed the offense. Counsel's decision to allow the State to admit the statement without objection was an informed, strategic decision that should not be second-guessed. Moreover, the Petitioner's aunt rebutted his claim that he had molested her daughter. Accordingly, we conclude that the Petitioner has failed to prove that counsel was deficient or that had counsel objected to this statement, there is a reasonable probability that the result of the proceeding would have been different.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-19-