# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 17, 2013

## TROY ALLEN PRUITT v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 40600541      John H. Gasaway, Judge**

---

**No. M2012-00897-CCA-R3-PC - Filed May 2, 2013**

---

The petitioner, Troy Allen Pruitt, appeals the Montgomery County Circuit Court's denial of post-conviction relief from his 2007 convictions in that court of aggravated robbery and fraudulent use of a credit card. Because the petitioner failed to establish his claim of ineffective assistance of counsel and because binding law-of-the-case determinations from his direct appeal defeat his claim of prejudice, we affirm the order of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

B. Nathan Hunt, Clarksville, Tennessee, for the appellant, Troy Allen Pruitt.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and John E. Finklea, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Montgomery County jury convicted the petitioner of two counts of aggravated robbery and two counts of fraudulent use of a credit card, and the trial court sentenced him to an effective sentence of 15 years in the Tennessee Department of Correction. Upon his appeal from those convictions, this court affirmed the trial court's judgments. *See State v. Troy Allen Pruitt*, No. M2008-02858-CCA-R3-CD (Tenn. Crim. App., Nashville, Apr. 28, 2010).

In *Troy Allen Pruitt*, this court explained the background of the convictions.

At the petitioner's trial, employees of the Tennessee Cash Cow in Clarksville described a March 20, 2006 robbery perpetrated by an armed man. Sabine Hutzel, the manager of the Tennessee Cash Cow, testified that, although the robber wore a bandana over his face so that only his eyes and the bridge of his nose were visible, she had identified the petitioner as the man who robbed her company in a photographic line-up. "Hutzel said she is very good with faces and eyes, and she said she would never forget the [petitioner's] eyes," which, she said, were brown. *Id.*, slip op. at 3.

Tammy Clinard, the area manager for Tennessee Cash Cow, testified that the robber had "'extremely red rosy cheeks,' which made him look like he had a wind burn or a sunburn." *Id.*

> Clinard testified that the police provided her with several photographs of suspects and asked her whether she recognized any suspect as the man who robbed the Cash Cow. She recalled that she identified someone initially but immediately knew that she had identified the wrong person, and she told the police officer that she had identified the wrong person. She never identified anyone else as the robbery suspect. Clinard then identified in court the [petitioner] as the man who had robbed the Cash Cow.

*Id.*, slip op. at 3.

Valerie Catignani, an employee of Tennessee Cash Cow on the day of the robbery, testified that she saw only the man's cheeks, which were "really pink," and his eyes. *Id.*, slip op. at 3-4. She testified that the man took her purse and that later that day the debit card from her purse was used to take $200 from her bank account. Ms. Catignani "identified in court the [petitioner] as the robber in this case." *Id.*, slip op. at 4.

> On cross-examination, Catignani testified that police officers never showed her any photographs or asked her to identify a suspect. She said the first time she saw the [petitioner] after the robbery was during the preliminary hearing, where the [petitioner] wore an orange jumpsuit and sat at a table designated for defendants. Catignani agreed that, at the preliminary hearing, she testified the [petitioner's] eyes were brown.

*Id.*

The women generally agreed that the robber placed the stolen cash in a backpack that he carried.

A man walking his dog on March 20, 2006, saw a man with a backpack running through the woods near the Tennessee Cash Cow. The man with the backpack got into a vehicle that was being driven very slowly on the dead-end street where the witness was walking. The witness testified that the vehicle's license number was "LMV 729." *Id.* The witness later identified a picture of the petitioner's car as the vehicle he saw that day. The county clerk testified that the petitioner was the registered owner of a gold 1988 Chevrolet with license plate "LMV 729." *Id.*

Police officers who investigated the robbery testified that they found "two dark blue bandanas" in the petitioner's residence and recovered more than $200 from the petitioner's wallet. *Id.*, slip op. at 5. A detective testified that a man named Micky Martin was photographed using Ms. Catignani's debit card at a bank automatic teller machine. *Id.*

> Claudia Killebrew, a deputy with the Montgomery County Sheriff's Office, testified she is a K-9 officer. She and her K-9 partner responded to a call about a robbery on March 20, 2006, at Tennessee Cash Cow. The two attempted to find the suspect, who was last seen running to a wooded area behind the building. The deputy said she and her K-9 partner started searching near the back of the building by a chain link fence. Her K-9 picked up a scent, which he followed through the woods, across a ditch, and then to Meadowbrook Drive. The K-9 lost the scent on that road.

*Id.*

Micky Lee Martin, a long-time, close friend of the petitioner, testified that he had been charged along with the petitioner with aggravated robbery, aggravated kidnapping, and fraudulent use of a credit or debit card.

> Martin recalled that on the morning of March 20, 2006, he was working on his wife's car at his home when the [petitioner], who drove a gold or champagne-colored Corsica, arrived. The [petitioner] visited for a short time and then left, saying that he would return later. The [petitioner] returned around 2:00 p.m. as Martin was finishing work on his wife's car. He said he needed brake fluid, so he and the [petitioner] went to Wal-mart.

-3-

On the way, the [petitioner] told him he had been in a fight and was scared the police were looking for him. He asked Martin to go to an ATM machine where the [petitioner] would not be seen. Martin drove to an ATM near his home. Martin said the [petitioner] showed him a small yellow piece of paper upon which were written two PIN numbers. Beside one of the PIN numbers was the word "old" and beside the other was the word "new." When Martin exited the car at the ATM, the [petitioner] read the two numbers to him from the yellow sheet, which the Defendant was holding. The number the Defendant read did not work, so Martin told the [petitioner] to read him the other number. That PIN number worked, and Martin retrieved $200 from the account. The two men split the money between them.

Martin testified that he knew the card did not belong to him or anyone he knew. He recognized the name as female, but he did not recall any more information about the name. He recalled the card was "greenish" and bore the number "50." [At trial,] Martin . . . . examined Valerie Catignani's stolen credit card. He said it was "greenish" with the number 50 in the top corner. He said the card looked like the card he used with the Defendant that day. Martin then identified a photograph of him withdrawing money from the ATM that day.

Martin testified he pled guilty to fraudulently using the credit card and had served over three hundred days in jail. He said, as a result of his guilty plea, the State agreed to drop the aggravated robbery and aggravated kidnapping charges against him. Martin said he had previously been convicted of aggravated robbery and four counts of aggravated burglary.

On cross-examination, Martin agreed he was on probation when he was charged for the offenses in this case. He conceded that he had seven previous felony convictions and that he was, therefore, a Range III offender. As such, he was facing long prison terms if convicted of aggravated robbery or aggravated kidnapping.

-4-

*Id.*, slip op. at 5-6.

> The [petitioner] called Detective Chad Koyama, who testified that a little more than $400 was taken during the robbery and that $200 was taken from Catignani's account using her debit card. He said he showed Clinard a photographic line-up that included the [petitioner's] picture, and she did not identify the [petitioner] as the suspect in this case. He agreed both Hutzel and Clinard said the suspect had dark eyes, and the [petitioner] had blue eyes. On cross-examination, the detective testified that the [petitioner's] eyes were, in fact, a dark blue. The detective recalled that no witnesses identified Martin at the preliminary hearing as being the man who robbed the Cash Cow.

*Id.*, slip op. at 6.

On March 25, 2011, the petitioner filed in the Montgomery County Circuit Court a timely petition for post-conviction relief in which he alleged that his convictions were the result of, *inter alia*, the ineffective assistance of trial counsel. The circuit court appointed counsel, who filed two amended petitions, and conducted an evidentiary hearing.

In the hearing, and pertinent to the issues raised now on appeal, the petitioner testified that trial counsel was inexperienced and failed to spend an adequate amount of time meeting with the petitioner prior to trial. He also testified that his trial counsel failed to move to obtain an expert in the field of eyewitness testimony and failed to utilize a witness to impugn the eyewitness testimony presented by the State. He further testified generally that counsel failed to properly voir dire the jury, to rebut the State's case, to present adequate evidence, to object to statements made by the trial judge, to advise the petitioner about his rights to testify and to not testify, to obtain statements of prospective State witnesses, and to object to inadmissible documents.

On cross-examination, the petitioner admitted that his "main" ground for post-conviction relief was counsel's failure to obtain and utilize an expert in the field of eyewitness identification. He testified that, in his motion for new trial, he presented an eyewitness expert, Dr. John Brigham, who testified that the photographic lineup could have been better and that, in the case of a gun being pointed at a witness, the witness would have difficulty seeing any detail other than the gun. The petitioner agreed, however, that this court said in his direct appeal that the use of Dr. Brigham would not have affected the outcome of the trial.

Trial counsel testified that *State v. Copeland* [1] was filed by our supreme court after the petitioner's trial but before the proceedings on the motion for new trial. Counsel acknowledged that he failed to raise the *Copeland* issue prior to trial as a precursor for appeal. Counsel testified that at the pretrial stage he was unaware that *Copeland* was on appeal. He opined that the use of *Copeland* at trial would have affected the result, stating, "[I]f the expert had been allowed to testify about weapon focus, the lineups and other things that the jury might have come to a different conclusion."

Counsel testified that, during the pendency of the motion for new trial, the trial court granted funds to retain an expert in the field of eyewitness testimony and that he obtained the services of the expert used in *Copeland*, Dr. John Brigham. Counsel commented upon Dr. Brigham's testimony in the motion for new trial proceeding:

> The main thing I can recollect is weapon focus; that the amount of time that the people had to observe . . . the only portion that the people could really see was the eyes; and he would talk about the time, duration, weapon focus, stress and other things, and the science behind witness identification to show why those identifications may have been unreliable.

Counsel recalled that the trial judge ruled that the issue was not justiciable in the motion for new trial because it had not been raised before trial. Counsel opined that he erred in not raising the issue prior to trial and that, but for the error, the result at trial would have been different.

On May 8, 2012, the court entered an order denying post-conviction relief. The petitioner then filed a timely notice of appeal to this court.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A.§ 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the post-conviction court's findings of fact are conclusive unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79

---

[1] *State v. Copeland*, 226 S.W.3d 287, 300-301 (Tenn. 2007) (overruling "*Coley*'s conclusion that no one, regardless of credentials or experience and no matter how questionable the evidence, can provide testimony on the issue of eyewitness identification" and concluding that the trial court's failure to admit expert testimony on eyewitness identification entitled Copeland to a new trial).

(Tenn.1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn.1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In the present case, we may handily narrow the appellate issues to that of trial counsel's asserted ineffective assistance in not presenting the *Copeland* issue prior to or during trial. All other claims of ineffective assistance, though mentioned in the petitioner's brief on appeal, were raised only topically in the post-conviction evidentiary hearing. None of these other claims came close to being established by clear and convincing evidence. Consequently, we turn to the issue of trial counsel's performance in handling the *Copeland* issue.

In 2000, our supreme court had rejected the claim that expert testimony on the reliability of eyewitness identification was admissible. *See State v. Coley*, 32 S.W.3d 831 (Tenn. 2000). *Copeland* overruled *Coley*'s per se ban on the admission of such evidence, and it did so via the rules of evidence and not via the due process right to present a defense. Indeed, the *Copeland* court focused entirely on Tennessee Rule of Evidence 702, concluding that "the test in *McDaniel* [*v. CSX Transportation, Inc.,* 955 S.W.2d 257 (Tenn. 1997),] is sufficient to allow the trial court to properly evaluate the admissibility of expert testimony on the reliability of eyewitness identification." *Copeland*, 226 S.W.3d at 300. The high court observed that "[t]he essential role of the judge, as the neutral arbiter in the trial, is to govern the admission of the evidence within the rules, permitting only that expert testimony which substantially assists the jury in its consideration of the issue." *Id.* Because the testimony Copeland sought to introduce during his trial met the prerequisites of *McDaniel*, the supreme court concluded that the trial court had erroneously excluded the testimony. The court then undertook a harmless error analysis, but, because the testimony of a single eyewitness was the crux of the case against Copeland, the high court found that the exclusion of the testimony could not be classified as harmless error. *Id.* at 302-03. Thus, *Copeland* does not *require* the admission of the testimony of an eyewitness identification expert but instead holds that such testimony is not per se inadmissible. *Ronald Dotson v. State*, No. W2007-01654-CCA-R3-PC, slip op. at 7 (Tenn. Crim. App., Jackson, Aug. 26, 2008).

In our opinion in the present petitioner's direct appeal, this court cited approvingly and relied in part upon its earlier opinion in *Joseph Vermeal v. State*, M2007-01676-CCA-R3-PC, slip op. at 10 (Tenn. Crim. App., Nashville, July 3, 2008). In *Joseph Vermeal*, this court said that the evidentiary rule announced in *Copeland* has "limit[ed] retroactive application to the case in which it is announced." *Joseph Vermeal*, slip op. at 10 (quoting *Blackwell v. Pennsylvania*, 589 A.2d 1094, 1099 (1991)). The *Troy Allen Pruitt* court then held,

> In accordance with our holdings in *Thomas* [*v. State*, 298 S.W.3d 610, 615-16 (Tenn. Crim. App. 2009)] and *Vermeal*, we conclude that *Copeland* should not apply retroactively to [Pruitt's] case and that the trial court did not err when it concluded that [Pruitt] was not entitled to a new trial on this basis.

*Troy Allen Pruitt*, slip op. at 13. This court also determined that any error arising from the trial court's failure to apply *Copeland* was harmless:

> In the case presently before us . . ., the evidence was more than sufficient to sustain the [petitioner's] conviction. In fact,

-8-

significant evidence, other than the eyewitness testimony, inculpated the [petitioner]: a man was seen fleeing from the Tennessee Cash Cow and getting into the [petitioner's] car, which was located on a street behind the woods behind the Tennessee Cash Cow; the [petitioner] gave Catignani's stolen credit card and a yellow post-it note upon which two PIN numbers were written to Martin; Martin used this credit card to retrieve $200 that he then split with the [petitioner]; when [the petitioner] was arrested, he was carrying more than $200 in denominations similar to those used by the Tennessee Cash Cow; and two blue bandanas similar to the one worn by the robber were found at the [petitioner's] home. In light of this evidence, we conclude that the [petitioner] cannot show that any error in the omission of expert testimony about eyewitness identification more probably than not affected the outcome of his trial[.] He is not, therefore, entitled to relief on this issue.

*Id.*, slip op. at 14.

Based upon *Troy Allen Pruitt* and *Joseph Vermeal*, *Copeland* applies retrospectively to only defendant Copeland's trial and not to any other trials conducted prior to the release of *Copeland* on May 23, 2007. In this determination, this court eschewed a "pipeline" approach. Thus, the general law as explicated in these two cases says that the petitioner would not have been entitled to introduce expert testimony had a pre-trial or mid-trial attempt to do so been made. Despite trial counsel's *mea culpa* presented in the post-conviction hearing, we doubt that he performed deficiently given the then applicable regime of *Coley* and the subsequent legal determination that *Copeland* did not apply to the petitioner's case.

Furthermore, apart from the persuasive but non-binding general law stated in *Troy Allen Pruitt*, the adjudications made in that direct appeal of this petitioner's case are the law of the case. "Under the doctrine of the law of the case, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case, which must be followed upon remand." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (citing *State v. Jefferson*, 31 S.W.3d 558, 560-61 (Tenn. 2000)). An issue decided in a prior appeal may only be reconsidered when:

(1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would

-9-

result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.*

No exception applies in the present case, and the petitioner is bound by not only the determination that the *Copeland* rule did not apply to his trial, but also the ruling that any error arising from his not being afforded the opportunity to introduce expert testimony was harmless. On this latter point, we remind the petitioner that "[t]his court's ruling on direct appeal that the [trial] error was harmless beyond a reasonable doubt equates to a lack of prejudice for an ineffective assistance of counsel claim." *Larry Paul Koffman v. State*, No. M2009-00951-CCA-R3-PC, slip op. at 3 (Tenn. Crim. App., Nashville, Sept. 29, 2010), *perm. app. denied* (Tenn. 2011); *Gabriel Antonio Clark v. State*, No. W2003-01017-CCA-R3-PC, slip op. at 3 (Tenn. Crim. App., Jackson, Mar. 24, 2004) ("We conclude, however, that any error was harmless beyond a reasonable doubt, and that the petitioner failed to establish prejudice as an element of his ineffective assistance of counsel claim."). Although the harmless error ruling in *Troy Allen Pruitt* did not utilize the constitutional standard, we conclude that the law-of-the-case determination of harmless error means that the petitioner failed to establish *Strickland* prejudice by clear and convincing evidence.

Accordingly, the order of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-10-