IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Jackson May 5, 2015

**BRIAN J. DODSON v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Maury County**
**No. 18714      Stella L. Hargrove, Judge**

---

**No. M2014-00693-CCA-R3-PC – Filed December 29, 2015**

---

The Petitioner, Brian J. Dodson, was convicted of first degree murder, attempted first degree murder, and aggravated assault, and he received an effective sentence of life imprisonment. Thereafter, he filed a petition for post-conviction relief, alleging that his trial counsel was ineffective and that the trial court violated his due process rights by refusing to delay the trial until a hospital records custodian arrived at the courthouse to authenticate the medical records of a witness. The post-conviction court denied the petition, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Jacob J. Hubbell (on appeal) and Charles M. Molder (at trial), Columbia, Tennessee, for the Appellant, Brian J. Dodson.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; T. Michel Bottoms, District Attorney General; and Kyle Dodd, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, this court summarized the proof adduced at trial as follows:

Officer Sarah Howell with the Columbia Police Department testified that she was on patrol the night of the offenses and responded to a reported stabbing at Parkview Manor Apartments around 3:45 a.m. on December 14, 2008. The dispatch information was that a male and a female had been stabbed. Officer Howell pulled into the apartment complex and drove to the last building at the end of the drive where she saw a woman standing at the bottom of the stairs. The woman was slouched over and had blood on her shirt, obviously bleeding from her chest area. . . .

Officer Howell testified that as she got out of her car and started walking toward the woman, the woman turned around and walked toward an apartment. Officer Howell followed the woman to the apartment and initially stood right inside the doorway. The woman was in the middle of the living room on her knees, having trouble breathing and "seemed kind of like she was in shock." The woman also appeared as though she was "[p]ossibly" under the influence of a narcotic.

Officer Howell testified that the woman identified herself as Crystal McKee and said that her cousin, Kim Malone, was dead. When Officer Howell asked [Ms.] McKee where [Ms.] Malone was, [Ms.] McKee said that she was in the kitchen. [Ms.] McKee told Officer Howell that she had been in the back of the apartment cleaning a bedroom when she heard [Ms.] Malone ("the victim") screaming. [Ms.] McKee said that she walked into the living room and saw a black male, whom she knew as "Lok," with his hands around the victim. At that point, "Lok" left the victim alone and approached [Ms.] McKee. He then proceeded to stab her with a long blade. [Ms.] McKee could not recall what "Lok" was wearing. Officer Howell asked [Ms.] McKee if the stabbing was related to "a drug deal gone bad," and [Ms.] McKee answered, "[N]o. It had something to do with whiskey," that "Lok" wanted her whiskey.

Officer Howell testified that, once backup officers arrived and cleared the scene, she walked into the apartment and found the victim lying facedown on the kitchen floor. The victim's head was in a pool of blood and there was a large,

open laceration on the left side of her neck. The victim did not have a pulse.

Crystal McKee testified that, . . . [around] 3:00 a.m. [on December 14, 2008], someone started knocking loudly on the [victim's] apartment door and calling the victim's phone. . . . [Ms.] McKee testified that eight to ten minutes after the victim went to answer the door, she heard the victim screaming and went to see what was happening. [Ms.] McKee looked around the corner and saw a man holding the victim around the waist, repeatedly stabbing her in the back, smiling the entire time. [Ms.] McKee exclaimed, "Oh, my God. She can't survive that," and the man looked directly at [Ms.] McKee and started "tearing" at the victim's throat with the knife. The man laid the victim down on the floor and approached [Ms.] McKee. He began stabbing her, so she grabbed a nearby fan to try to push him away. She attempted to dial 911, and the man stabbed her in the back. When he pulled the knife out, she misdialed the emergency number.

[Ms.] McKee testified that she was able to run to the bathroom and lock the door. She then called 911. She heard what sounded like a cabinet door slamming, looked out of the bathroom, and saw the chain on the front door swinging. Believing that the man was gone, [Ms.] McKee exited the bathroom to look for the emergency personnel. [Ms.] McKee waited outside for what "felt like forever" and then went back inside to be near the victim.

[Ms.] McKee testified that, when the police arrived, . . . [t]he officer asked [Ms.] McKee if she knew who had stabbed the victim, and [Ms.] McKee said, "Lok" and gave a description of what "Lok" was wearing. [Ms.] McKee said that she immediately recognized the attacker and said that she knew him as "Lok." She had seen him at the victim's apartment on previous occasions but had never had a conversation with him or known where he lived. On the night of the stabbing, he was wearing a white cap on top of a "black blue bandana" and a blue and black flannel coat. [Ms.] McKee identified the [Petitioner] in court as the attacker and the person she knew as "Lok."

[Ms.] McKee testified that she was transported to the trauma unit at Vanderbilt Hospital and was in and out of the hospital for three months because hematomas kept building up in the area under her left chest. [Ms.] McKee talked to Detective Duncan while she was in the trauma unit, about four or five hours after the stabbing, and told him "Lok" was the person responsible for the stabbing.

. . . .

Nathan Donovan testified that he worked with the [Petitioner] at Southern Glass Company in Nashville for four months and that the [Petitioner] was known as "Lok" . . . .

. . . .

Adrian Walker, who was presently incarcerated in the Williamson County Jail on a probation violation for a theft conviction, testified that he was incarcerated with the [Petitioner] in early 2009 in the Maury County Jail. The two shared a cell together, during which time the [Petitioner] told him about a situation where two women who owed him $300 "got cut up . . . reasonably bad" and that it was "messed up." Walker said that the [Petitioner] told him that he had been preparing to go out of town for his birthday and "basically was going to collect the money," but the women did not have it. The [Petitioner] told him that he went to the home of a woman named Lena after the attack and changed his clothes at her house. The [Petitioner] also told him that the State did not have the knife. The [Petitioner] showed him black and white photographs of the murder scene and the two victims.

Walker testified that, on another occasion when he and the [Petitioner] were in the same cell in June 2009, the [Petitioner] showed him color photographs of the murder scene and told him that the State "had dropped the ball . . . because they picked up the dumpster and . . . [it] went into the trash container instead of . . . driving straight to the detective's office." When showing Walker the photographs, the [Petitioner] said that the women "got really messed up." The [Petitioner] mentioned to him several times that "it was just about 300 dollars." On cross-examination, Walker

- 4 -

testified that he also saw photographs of a dumpster and a lot of trash but, when presented with the discovery photographs, he was unable to point to any photograph that showed a dumpster. . . .

Officer Andre Martin with the Columbia Police Department testified that he was instructed to retrieve a dumpster from Parkview Manor Apartments on December 15, 2008, at 10:00 a.m. because officers believed the [Petitioner] had placed a bag inside that dumpster. Officer Martin went to the apartment complex with a garbage truck and a flatbed truck and instructed the driver of the garbage truck to pick up the dumpster in front of Building G and place it on the flatbed truck. . . . Instead of following the instructions, however, the garbage truck emptied the dumpster into the garbage truck. Officers had to search through the contents of the garbage truck for a black plastic bag but did not find the bag they were looking for.

. . . .

Dr. Amy McMaster, qualified as an expert in the field of forensic pathology, testified that she performed the autopsy on the victim. Dr. McMaster noted that the victim suffered sixteen stab or cut wounds to various areas of her body. Dr. McMaster surmised that the stab wound to the left side of the victim's chest that injured the left lung and the four stab wounds to her back that injured her ribs, spine, and spinal cord would have been fatal.

Helen Blackman Hannah testified that she knew the [Petitioner] in December 2008, and he went by the nickname "Lok." . . .

Detective Jeff Duncan with the Columbia Police Department testified that he was the lead detective in this case and responded to the scene shortly after 4:00 a.m. on December 14, 2008. Thereafter, he traveled to Vanderbilt Hospital to talk to Crystal McKee, who was coherent but "appeared to be still in shock." [Ms.] McKee gave him a description of what had happened and of her attacker. Detective Duncan learned of a traffic stop that occurred the

night before and watched the videotape of the stop. He also spoke to Nathan Donovan due to Donovan's connection to the phone number that had made calls to the victim's phone. As a result of the police investigation, the [Petitioner] was developed as the suspect. The officers located the [Petitioner's] apartment, and Detective Duncan noted that it was approximately fifty yards from the victim's apartment. Officers executed a search warrant on the [Petitioner's] residence but did not discover the items they were looking for. They were eventually able to locate the [Petitioner], and an examination of him revealed no evidence of cuts or bleeding. Detective Duncan directed the submission of numerous items to the lab for testing.

. . . .

Agent Hunter Greene, a forensic scientist with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory, testified that she examined items of evidence submitted in this case for latent fingerprints, and her examination failed to reveal the presence of any identifiable prints.

. . . .

Agent Charles Hardy, a forensic scientist in the Swab and DNA Unit of the TBI Crime Laboratory, testified that . . . [t]he [Petitioner's] DNA was not found on any blood samples collected from the victim's apartment, nor was the victim's or [Ms.] McKee's DNA found on any blood samples collected from the [Petitioner's] apartment. . . .

. . . .

Brook Lee testified that she lived at 320 Roberts Drive in the Parkview Manor Apartments in December 2008. Lee and the [Petitioner] were engaged at the time, and he stayed with her "from time to time." On December 13, she and the [Petitioner] left her apartment around 9:00 p.m. to get something to eat, but they ended up stopping at two different gas stations. After leaving the second gas station, they were pulled over by a police officer. Thereafter, sometime around

10:30 or 10:45 p.m., they went to a car wash. They finally went back to Lee's apartment around midnight.

Lee testified that, at her apartment, she and the [Petitioner] ate and watched a movie, which ended around 2:00 or 2:15 a.m. At some point, both Lee and the [Petitioner] fell asleep, but Lee was awakened around 3:00 a.m. when she heard the door open and discovered that the [Petitioner] was going outside. He told her that he was going to smoke and let the dog out, then he returned shortly thereafter. Once the [Petitioner] was back inside the apartment, Lee fell asleep again but woke up when she heard someone knocking on the door. Looking through the peephole, Lee saw that a woman named "Banks" who lived in the apartment complex was at the door, but Lee did not open it. The [Petitioner] asked who was at the door, and Lee told him. A few minutes later, the [Petitioner] walked outside and was gone about fifteen minutes. It was approximately 3:30 a.m. at the time.

Lee testified that the [Petitioner] looked the same when he returned as he had when he left. He was wearing dark pants, a flannel shirt, and a jacket. She thought he also had on his toboggan hat and a do-rag. The [Petitioner] was not out of breath or excited and did not have any blood on him. Once back in the apartment, the [Petitioner] sat on the couch for fifteen minutes and then took a shower. Five minutes later, Lee heard sirens. When the [Petitioner] got out of the shower, Lee got into bed. The [Petitioner] put on his work clothes and joined her. Shortly thereafter, the [Petitioner] got up to get ready for work and left around 5:00 a.m. Lee noted that, when the [Petitioner] got out of the shower, he had shaved his head. He explained to her that growing out his hair was "'just too high maintenance[.]'" The [Petitioner] had also shaved his beard and eyebrows. Lee stated that she did not observe the [Petitioner] talking on the phone the entire time they were together that evening and early morning, aside from during the traffic stop.

Clifford Bowen, an assistant in counsel's law office, testified . . . that he was familiar with all 714 photographs [in the discovery materials for the Petitioner's case] and said

there was no photograph of a dumpster with trash in it or a photograph of a garbage truck. . . .

　　　. . . .

Antonio Turentine testified that he was at the Parkview Manor Apartments in December 2008, the night before the stabbing incident, to attend a cookout for his cousin's birthday. Antonio's cousin lived in the apartment above the [Petitioner] and his girlfriend. The cookout started around 5:00 or 6:00 p.m. and lasted until 2:00 or 2:30 a.m. When Antonio was leaving the party, he saw the [Petitioner] outside with a puppy, either rolling up the windows of his car or making sure his car was locked.

Randall Turentine testified that he used to "hang out" at Parkview Manor Apartments and remembered a time he attended a party there with his cousin, Antonio. Randall recalled that he saw the [Petitioner] sometime during that evening when "it was just getting dark" outside.

The [Petitioner] testified that he lived with his girlfriend, Brook Lee, at 320 Roberts Drive in December 2008. Early in the evening of December 13, 2008, the [Petitioner] was alone at the apartment, so he stopped by a party that was going on in the apartment upstairs and talked to some people, specifically the "Turentine boys." Around 7:00 or 8:00 p.m., the [Petitioner] and Lee left the apartment and "rode around . . . contemplating . . . where [they] wanted to go." They eventually decided to go to Nashville but were pulled over by the police before heading in that direction. After the traffic stop, they went to a car wash and then decided to return to Lee's apartment because it was around midnight.

The [Petitioner] testified that, back at the apartment, he turned up the heat and took off his flannel jacket and hat. Lee prepared dinner, and the two sat down to watch a movie around 12:15 or 12:30 a.m. After they finished watching the movie, there was a knock on the door. Lee went to the door and saw that it was Ms. Banks, who also lived in the complex,

at the door. The [Petitioner] explained that Ms. Banks was an elderly lady who sometimes came over to ask for cigarettes.

The [Petitioner] testified that, around 3:10 or 3:15 a.m., he left the apartment to take his puppy out and go to his car to get his cigarettes and have a smoke. He estimated that he was outside for about five minutes before he went back in. The [Petitioner] explained that it was not unusual for him to be outside at that hour because he worked for a company in Nashville and had to be at work at 6:00 a.m. As such, he would typically get up around 3:30 or 4:00 a.m. to get ready for work.

The [Petitioner] testified that he went back outside five to ten minutes later, around 3:30 or 3:40 a.m. He let the puppy out again and went to his car to roll up the windows and lock the door. When he return[ed] to the apartment, he sat on the couch and watched television for fifteen to twenty minutes. After that, he shaved his head, beard, and eyebrows and took a shower.

The [Petitioner] testified that, while he was in the shower, Lee came in and told him that there had been a stabbing or shooting in the apartment complex. The [Petitioner] told her to stay away from the window in case someone was outside shooting. After his shower, the [Petitioner] dressed in lounge clothes and got into bed. He woke up around 5:00 or 5:30 a.m., ate breakfast, and left the apartment.

. . . .

The [Petitioner] testified that he met the victim in the summer of 2008 when she was having car trouble, and he helped start her car. He knew that the victim lived in an apartment in the building adjacent to his girlfriend's building and talked to her on the phone and visited her apartment occasionally. He had seen Crystal McKee before but had never had a conversation with her. The [Petitioner] denied going to the victim's apartment or calling her on the night of the incident. The [Petitioner] said that he had not received any discovery photographs in January 2009 – the first time he

and Adrian Walker were housed together in the Maury County Jail.

On cross-examination, the [Petitioner] recalled that he showed Adrian Walker some black and white photographs of the crime scene but said that he did not recall showing Walker any color photographs. However, he said that he did not tell Walker that the women were stabbed because they owed him $300 for drugs. The [Petitioner] admitted that he received a copy of his case file from counsel and was aware of the situation regarding the contents of the dumpster being lost, but he denied mentioning anything about that to Walker.

. . . .

After the conclusion of the proof, the jury convicted the [Petitioner] of the first degree premeditated murder of Kim Malone and the attempted first degree murder and aggravated assault of Crystal McKee.

State v. Brian Jermaine Dodson, No. M2011-00523-CCA-R3-CD, 2012 WL 2403624, at *1-9 (Tenn. Crim. App. at Nashville, June 27, 2012) (footnotes omitted).

Thereafter, the Petitioner filed a timely petition for post-conviction relief, alleging in pertinent part that his due process rights were violated when the trial court denied his request for a brief recess to allow a favorable witness to arrive and that trial counsel was ineffective by failing to call an expert in eyewitness identification.[1]

At the post-conviction hearing, the Petitioner testified that trial counsel represented him at trial and at the sentencing hearing but that a different attorney represented him at the motion for new trial hearing. The Petitioner said that he was incarcerated the entire time he was represented by trial counsel. He met with trial counsel three or four times; they spoke over the telephone on a few occasions; and they also communicated through letters. The Petitioner acknowledged that trial counsel contributed money to a Telecoin card so that the Petitioner could call trial counsel's office. The Petitioner thought trial counsel could have kept him more informed and better prepared for trial. Nevertheless, he acknowledged that trial counsel talked with him about the issues and the type of defense they would pursue. Additionally, trial counsel supplied the Petitioner with discovery materials. The Petitioner later conceded

---

[1] The Petitioner has abandoned the remainder of his claims on appeal. We will concern our recitation of the facts mainly to the claims he raises on appeal.

that "it wasn't so much that [trial counsel] didn't keep [the Petitioner] informed as much [as] it was that [the Petitioner] disagreed with [trial counsel's] trial strategy." The Petitioner opined that trial counsel's failure to "stay on course" was due to his "lack of seasoning or inexperience."

The Petitioner conceded that trial counsel informed him of the charges he was facing and the potential sentences. He alleged, however, that the information was "touch-and-go" and infrequent.

The Petitioner said that he and trial counsel decided early in the case that the Petitioner would need to testify. Trial counsel did not, however, ask the Petitioner any mock questions to prepare him to testify.

The Petitioner said that Ms. McKee's medical records from Vanderbilt Hospital reflected that when she was asked who stabbed her, she responded, "The assailants were unknown." Trial counsel subpoenaed the hospital's records custodian, but she did not arrive at the courthouse in time to testify at trial. The Petitioner did not understand why trial counsel did not try to have the records admitted without the records custodian.

The Petitioner thought that identification was the State's weakest issue; however, trial counsel failed to make it a central issue of the defense. He acknowledged that the jury heard the 911 call during which Ms. McKee said that she did not know who the perpetrator was. He opined that Ms. McKee's medical records would have provided another instance where Ms. McKee said that she did not know the identity of the perpetrator. The Petitioner acknowledged that during closing argument, trial counsel argued that the jury should not believe Ms. McKee's identification of the Petitioner because she did not identify him as the perpetrator during the 911 call. The Petitioner also acknowledged that the records custodian's failure to be present in court on time was not trial counsel's fault.

The Petitioner contended that the trial court committed a due process violation by not granting a twenty to thirty minute recess so that the hospital's records custodian could get to court. He acknowledged that he was not at the hospital during Ms. McKee's intake procedure and that he did not know if the medical staff asked who stabbed her. Nevertheless, he questioned why the intake report would reflect that Ms. McKee said her assailants were unknown if the medical staff had not asked about it.

The Petitioner acknowledged that trial counsel sought the help of Dr. Jeffrey Neuschatz, an expert in eyewitness identification. The Petitioner wanted Dr. Neuschatz to testify regarding factors that impact the reliability of eyewitness identification, such as cross-race identification and stress. The Petitioner told trial counsel that he wanted Dr. Neuschatz to testify, but trial counsel did not consult with the Petitioner regarding the

decision whether to call Dr. Neuschatz. The Petitioner acknowledged he and trial counsel might have talked about Dr. Neuschatz's testimony having the potential to strengthen the State's case, but he did not recall such a conversation. The Petitioner contended that the decision not to call Dr. Neuschatz to testify was not a joint decision.

The Petitioner said that he had never been in the same room with Ms. McKee but that he might have seen her "in passing," noting that his girlfriend and Ms. McKee lived close to each other. Although Ms. McKee said that she had seen the Petitioner at the victim's apartment, the Petitioner did not recall seeing Ms. McKee there. The Petitioner said that he was a stranger to Ms. McKee, explaining, "I wasn't acquainted with her." He asserted that "just because she testified that she was familiar with me doesn't actually mean that she was familiar with me."

Trial counsel testified that he had practiced law for twelve years and that his practice was almost exclusively criminal law. He was appointed to represent the Petitioner in early spring 2009 and was relieved as counsel after the sentencing hearing but before the motion for new trial hearing.

During trial counsel's representation, he communicated with the Petitioner every time they were in court, visited the Petitioner in jail, and put money in the Petitioner's jail account so that the Petitioner could call trial counsel's office. Trial counsel said that he and the Petitioner spoke often over the telephone.

Trial counsel recalled that the Petitioner was active in the case and did a lot of reading on the issues. The Petitioner frequently asked trial counsel to print cases for him. Additionally, trial counsel gave the Petitioner copies of the discovery materials. Over the fourteen to fifteen months trial counsel represented the Petitioner, trial counsel visited the Petitioner in jail approximately eighteen to twenty times. Trial counsel said that the Petitioner was heavily involved in every aspect of the case. They talked many times and had a plan for how to proceed at trial.

Trial counsel said that Ms. McKee's identification of the Petitioner as the perpetrator was a "major issue" at trial. Ms. McKee did not identify the Petitioner by name but by a nickname. Ms. McKee said that she had seen the Petitioner selling drugs to her cousin, the victim.

Trial counsel said that the State played a recording of Ms. McKee's call to 911. On the tape, Ms. McKee stated that she did not know the identity of the person who stabbed her and the victim. Trial counsel cross-examined Ms. McKee about her failure to identify the Petitioner during the 911 call. During closing argument, trial counsel argued that although the call occurred close in time to the stabbing, Ms. McKee was unable to identify her assailant at that time.

Trial counsel obtained funding to hire Dr. Neuschatz, an expert in eyewitness identification who was employed by the University of Alabama. Dr. Neuschatz would have testified that various factors could negatively impact the reliability of an identification, namely when the witness identified a person of a different race, if a weapon was involved, whether the event was a high-stress situation, and the proximity of the witness to the person being identified. Trial counsel said that Dr. Neuschatz asked if Ms. McKee had known the Petitioner prior to the incident. Trial counsel responded that Ms. McKee had testified at the preliminary hearing that she had "seen [the Petitioner] around" and that she had known the Petitioner as the victim's drug dealer. Dr. Neuschatz said that Ms. McKee's "familiar knowledge" of the Petitioner would strengthen her identification of the Petitioner, which was the opposite of what the defense wanted.

Trial counsel said that he advised the Petitioner that Dr. Neuschatz's testimony could hurt the defense and benefit the State and that trial counsel did not think having Dr. Neuschatz testify would be worth the risk. The Petitioner was disappointed, but trial counsel thought he agreed with the decision not to call Dr. Neuschatz.

Trial counsel said that after the decision was made not to call Dr. Neuschatz, he focused on impeaching Ms. McKee's identification of the Petitioner. Trial counsel did not know what conversation had taken place between Ms. McKee and the medical staff, but Ms. McKee's medical records reflected that during the intake interview, she stated that her assailant was unknown. On cross-examination, he asked Ms. McKee if she had told hospital staff that she could not identify her assailant, and she denied telling hospital staff that she could not identify the assailant.

Prior to trial, trial counsel issued a subpoena and a subpoena duces tecum for the records custodian at Vanderbilt Hospital in order to authenticate Ms. McKee's medical records. Trial counsel was required to issue the subpoenas because the State refused to stipulate to the medical records. Trial counsel knew that the subpoenas were served. During the presentation of the defense's proof, trial counsel learned that the records custodian had not arrived. He called the hospital and learned that she was still there. She told trial counsel that she was not aware that she needed to come to court. At that time, trial counsel had a "heated" conversation with her, during which he told her to come to court or he would have her put in jail. At that point, she left the hospital and began driving to the courthouse.

Trial counsel said that he put on his remaining witnesses, whose testimonies were very short. At the conclusion of his proof, the records custodian was approximately thirty minutes away from the courthouse. Trial counsel thought he informed the trial court that the records custodian had misunderstood the subpoena and that he needed a delay for his

witness to arrive.[2] He said, "I forget the exact language, but it was denied." Following the denial, trial counsel concluded the defense's proof. Trial counsel acknowledged that the jury had already heard the tape of the 911 call during which Ms. McKee said that she did not know the identity of her assailant. Nevertheless, trial counsel wanted the jury to hear that Ms. McKee also told the hospital's medical staff that she could not identify her assailant. He explained that the medical records would have added to the inconsistencies in her identification.

Trial counsel said that he could not think of anything else he should have done on the Petitioner's case. He explained that "we just exhausted everything I could think of" but that "a lot of things didn't work out."

On cross-examination, trial counsel stated that Ms. McKee was the State's key witness because the main issue in the case was identification. At the preliminary hearing, Ms. McKee testified that she did not know the Petitioner well and did not know his name but that she had seen him three to six times and knew his nickname. Trial counsel contacted Dr. Neuschatz about discrediting Ms. McKee's identification due to the high-stress situation, the use of a weapon, and the cross-racial identification.[3] Additionally, Ms. McKee had used cocaine at some point prior to the incident. However, Dr. Neuschatz said that Ms. McKee's "familiar knowledge" of the Petitioner, such as seeing him on prior occasions, would have bolstered her identification. Trial counsel acknowledged that "the discovery was kind of riddled with these familiar knowledge's [(sic)], where she had seen him at the apartment complex." Trial counsel said Dr. Neuschatz would have been a good witness if the State had not asked about Ms. McKee's familiarity with the Petitioner, but trial counsel was certain the State would ask about it. Trial counsel opined that if Dr. Neuschatz had testified that Ms. McKee's familiar knowledge of the Petitioner would have bolstered her identification, the testimony would have been "catastrophic to the [d]efense."

Trial counsel said that he told the Petitioner that it would be "too risky" to call Dr. Neuschatz as a witness, and the Petitioner did not object "too much." Because the Petitioner had been very "vocal" in other areas of the case, trial counsel thought the Petitioner agreed with the decision not to call Dr. Neuschatz.

At the conclusion of the hearing, the post-conviction court accredited trial counsel's testimony that he made a strategic decision not to call Dr. Neuschatz because

---

[2] We note that in his brief, the Petitioner did not provide a citation to the trial transcripts where trial counsel requested a delay, and our review revealed no such request in the trial transcripts. Nevertheless, the post-conviction court, which was also the trial court, referenced its refusal to delay the trial in order for the records custodian to arrive.

[3] See State v. Copeland, 226 S.W.3d 287, 302-04 (Tenn. 2007) (stating that an expert witness may testify regarding factors that impact the reliability of eyewitness identification).

he feared the doctor's testimony would benefit the State and hurt the Petitioner. The court further accredited trial counsel's assertion that the Petitioner did not have a "strong objection" to the decision. The post-conviction court further found that the medical records reflected that Ms. McKee reported that her assailants were unknown, that she was in pain at the time of the conversation, and that she was "hesitant to discuss the incident."

The post-conviction court observed that

> Ms. McKee testified and was cross-examined on the second day of trial. The State rested on the third day; the defense called three witnesses. On the fourth day, the defense called eleven witnesses, including [the Petitioner]. The [trial court] refused to allow additional time for the custodian of records to arrive, believing that 30 minutes was not an accurate assessment of time for her to arrive in Maury County. Obviously, this witness could only enable Petitioner to get the Vanderbilt records into evidence. Some intake person had noted on the records that the assailants were unknown. Ms. McKee never, ever denied that she did not know her assailant's name at the time she was stabbed.

The post-conviction court found that the Petitioner was not entitled to relief. On appeal, the Petitioner challenges the post-conviction court's ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See

Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

The State argues that the Petitioner is not entitled to post-conviction relief due to any alleged due process violation by the trial court because he did not present it for review in his direct appeal. We agree. Under the Post-Conviction Procedure Act, waiver occurs when the "the petitioner personally or through an attorney fail[s] to present [the claim] for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g). Waiver in a post-conviction context is determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney. House v. State, 911 S.W.2d 705, 714 (Tenn. 1995). The presumption that a ground not raised has been waived is rebuttable. Tenn. Code Ann. § 40-30-106(g). To rebut the presumption, however, the petition must contain "allegations of fact supporting each claim for relief set forth in the petition and allegations of fact explaining why each ground for relief was not previously presented in any earlier proceeding." Id. § 40-30-104(e). The record leads us to conclude that the claim of a due process violation was waived by the Petitioner's failure to raise it on direct appeal.

The Petitioner's remaining claim, which is that trial counsel was ineffective by failing to call Dr. Neuschatz to testify at trial, is equally unavailing. The Petitioner did

not produce Dr. Neuschatz to testify at his post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on the potential benefit this witness might have offered to the Petitioner's case. Id. Accordingly, the Petitioner has failed to demonstrate prejudice. Moreover, trial counsel testified that a tactical decision was made not to call the doctor because his testimony could potentially bolster Ms. McKee's identification of the Petitioner. On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). The post-conviction court found that trial counsel's tactical decision was made after thorough preparation for trial. We agree. We conclude that the Petitioner is not entitled to post-conviction relief on this basis.

### III. Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE